UNITED STATES of America, Appellee,

v.

Milan BAGARIC, Mile Markich, Ante Ljubas, Vinko Logarusic, Ranko Primorac, and Drago Sudar, Defendants-Appellants.

Nos. 887, 875, 932, 877, 876 and 886, Dockets 82–1247, 82–1249, 82–1251, 82–1253, 82–1255 and 82–1257.

United States Court of Appeals, Second Circuit.

Argued March 9, 1983.

Decided April 14, 1983.

Stuart J. Baskin, Sp. Asst. U.S. Atty., S.D.N.Y., New York City (John S. Martin, Jr., U.S. Atty., Paul L. Shechtman, Roanne L. Mann, Asst. U.S. Attys., New York City, of counsel), for the United States of America.

Michael D. Monico, Chicago, Ill. (Barry A. Spevack, Chicago, Ill., of counsel), for Milan Bagaric.

Jeffrey A. Rabin, Brooklyn, N.Y., for Mile Markich.

Michael Young, New York City, for Ante Ljubas.

Newman & Adler, New York City (Roger Bennet Adler, New York City, of counsel), for Vinko Logarusic and Drago Sudar.

Jacob R. Evseroff, Brooklyn, N.Y., for Ranko Primorac.

Before KAUFMAN, TIMBERS and KEARSE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Milan Bagaric, Mile Markich, Ante Ljubas, Vinko Logarusic, Ranko Primorac, and Drago Sudar appeal from judgments of conviction in the United States District Court for the Southern District of New York, after a trial before Chief Judge Motley and a jury. Appellants urge reversal, relying not only on a series of claimed infirmities of the usual sort, but also upon this court's recent refusal to permit prosecution of a terrorist organization pursuant to the Racketeer Influenced and Corrupt Organizations Act, where the Government failed to allege the group or its activities possessed any financial dimension or purpose. *See United States v. Ivic,* 700 F.2d 51 (2d Cir.1983). We are asked to expand that holding to the facts of this case. We decline to do so, since the overwhelming proof at trial showed that the defendants, acting through their criminal enterprise, perpetrated an extensive international extortion scheme using the United States and foreign mails. In addition, the defendants directed numerous acts of violence against certain supporters of Yugoslavia. Because we also reject appellants' myriad other contentions, we affirm the convictions.

I

The massive, complex and convoluted record of this thirteen-week trial established that appellants were members of a Croatian terrorist group operating principally in New York, Chicago, and Los Angeles, with participants in Cleveland, San Francisco, Toronto, South America, and Europe. Acting through their criminal enterprise, they perpetrated an international extortion scheme against "moderate Croatians" and persons they believed to be supporters of the government of Yugoslavia, resorting to multiple acts of violence against those not sufficiently sympathetic to their cause. We chronicle the history of their activities in some detail.

Operating from his home base in Chicago, Ante Ljubas began in late 1974 to recruit and hire persons to commit murders and bombings. In each case, the intended victim was to be an individual considered unsympathetic to the cause of Croatian independence from Yugoslavia. In time, Ljubas approached a long-time acquaintance, Frank Korenic, inquiring whether Korenic could obtain explosives, and requesting that Korenic introduce Ljubas to one Joe Neary. Neary, a notorious Chicago gangster, was a frequent customer at a restaurant where Korenic's ex-wife was a waitress, and the two men had known one another since 1973. Korenic took Ljubas to Neary's home, where Ljubas was introduced to Neary and another local gangster, Louis Almeida.

Ljubas told these two men he "was working with other people," and would be willing to pay well for a series of contract killings. He offered $20,000 for the first murder, and $10,000 for each of approximately ten additional assassinations. Neary and Almeida agreed to perform the killings. Accordingly, Ljubas gave them a photograph and the address of the first intended victim, John Badovinac. At that time, Badovinac was president of the Croatian Fraternal Union in Pittsburgh, Pennsylvania, an organization Ljubas regarded as pro-Yugoslavian.

In February, 1975, Neary and Almeida travelled to Pittsburgh, and went to Badovinac's office. Uncertain whether that was the best locale at which to carry out the murder, they drove to Badovinac's home address and "look[ed] the place over[,] trying to figure out how . . . to assassinate him there." Still undecided, they telephoned Badovinac's office, only to discover, from his secretary, that Badovinac was out of town attending a meeting. Neary and Almeida returned to Chicago to tell Ljubas of their frustration. The three men met at a restaurant near Ljubas's home, where Ljubas expressed his unhappiness that Neary and Almeida had not "[gotten] the job done."

In March, Neary and Almeida set off to Pittsburgh a second time. En route, they were stopped by Ohio police for speeding. A search of their car turned up a .38 Colt firearm with a four-inch barrel, a .380 automatic Barretta, a .380 Walther PPKS with silencer, and a photograph of Badovinac.

Shortly after his arrest on firearms charges, Almeida told Illinois state police that Ante Ljubas had approached Neary and Almeida and hired them to murder a man in Pittsburgh.

Undeterred by the intervention of fate which spared Badovinac, Ljubas sought out co-appellant Milan Bagaric, and had Bagaric introduce him to Ante Caran.[1] Bagaric and Ljubas demonstrated to Caran the nature and seriousness of their endeavor. Bagaric showed him explosives the two men were storing in Bagaric's basement, and Ljubas instructed Caran on techniques of bomb construction. Shortly thereafter, apparently convinced of Caran's *bona fides,* Ljubas asked Caran if he would be willing to recruit two men to bomb the Pittsburgh home of Milan Vranes, an officer of the Croatian Fraternal Union. Ljubas provided Caran with the address of Vranes's home in Pittsburgh and told Caran to pick up the bomb at Bagaric's apartment. Caran acquired the services of two friends, Andrija Skrabo and Vjelko Jaksic.[2] The three men went to Bagaric's home, where they were shown a bomb and timer device built by Bagaric. Skrabo and Jaksic drove to Pittsburgh with the bomb.

In Pittsburgh, the two men had difficulty locating Vranes's home. After consulting a local telephone directory, they drove to an address other than that provided by Ljubas. They set the timer on the bomb and left it in a snowbank near the sidewalk of that house, later learning from a radio broadcast

---

**1.** As will be seen, Caran, a key witness for the Government in this case, was a major participant in the affairs of appellants' criminal enterprise. He was convicted in an earlier trial of the principal New York based members of the group, and began cooperating with the United States Attorney's Office and the Joint Terrorism Task Force, which brings together agents and detectives of the Federal Bureau of Investigation and the New York City Arson Squad. During debriefing by the Government, Caran confessed to the murder of Krizan Brzic in Los Angeles, *see infra.* Because Caran had not been promised immunity for murder, the United States Attorney informed California authorities of Caran's admission. In exchange for a promise of nonprosecution by the Los Angeles District Attorney, Caran waived venue and

pleaded guilty to an information before Judge Motley charging Caran with having conspired to deprive Brzic of his civil rights, resulting in the latter's death, 18 U.S.C. § 241. At the trial of this case, Caran testified for the Government pursuant to a standard cooperation agreement, and faced a possible maximum sentence of life, *id.,* plus thirty-five years, the maximum aggregate prison term for the violations in the previous trial.

On July 9, 1982, Judge Pollack, before whom the sentencings of Caran were consolidated, sentenced him to fifteen years imprisonment.

**2.** Skrabo and Vjelko Jaksic testified for the Government pursuant to promises of nonprosecution and under orders of use immunity.

that the bomb had exploded. Soon after, Bagaric informed them they had bombed the wrong house.

This series of misadventures in Pittsburgh seems reminiscent of Inspector Clouseau-style bumbling. Unfortunately, tragedy soon replaced what had appeared to be a comedy of errors. Ljubas and Bagaric, undaunted, continued their private war, taking on new soldiers along the way. Beginning in early 1977, the members of the criminal enterprise began an operation to stockpile dynamite in the United States and to transport it for use in various cities.[3] Ljubas asked Caran to arrange for the use of an automobile "to go to Canada to bring some explosive[s]." Caran secured the assistance of Mico Jaksic, brother of Vjelko.[4] Ljubas, Caran, and Mico Jaksic drove to Canada in Jaksic's car. Their destination was a small rural town, Elliott Lake, Ontario, site of the huge Dennison uranium mines, the ex-employer of appellant Mile Markich.

Upon arrival in Elliott Lake, Ljubas departed alone in the car. He rejoined Caran and Mico Jaksic twenty minutes later, with a bag containing approximately twenty sticks of dynamite which he showed the two men. The dynamite was manufactured by CIL Inc., a Canadian company, bore the coded manufacturing date D7 (signifying April, 1977 manufacture), and had been shipped in April and May of 1977 to Dennison Mines. Ljubas, Caran, and Jaksic then drove to the Toronto area, where they stopped at the home of Milan Rukavina, a Croatian acquaintance of Caran. To ensure they would not be observed, they drove into Rukavina's garage, where Jaksic packed the dynamite into the door panels of the car.

Blasting caps, also obtained by Ljubas, were separated from the dynamite and were stored "underneath the dashboard so they would blend in with the rest of the wires." Ljubas left the two men at this point, after instructing them to transport the contraband across the United States-Canada border and deliver it to Markich in Skokie, Illinois. Several days later, Caran travelled to Skokie, telephoned Markich to receive directions to the latter's home, and brought most of the dynamite and blasting caps to Markich, retaining some for his own use.[5] After Markich hid the explosives, the two men spoke briefly "[a]bout Croatia and [the] Croatian cause." Caran returned to his home in Milwaukee, and later travelled to San Francisco. There, he went to the home of one Mile Boban, and left the explosives he had not given Markich. Bagaric came to San Francisco and wired the explosives into bombs.[6]

Also in mid-1977, appellants formalized and commenced their principal operation, a scheme to extort money from so-called "moderate" Croatians in the United States. Ljubas travelled to West Germany, where he and others committed to the violent overthrow of the Belgrade government determined to adopt a tactic which had previously been employed by Algerian terrorists seeking independence from France. They would send letters to "bad Croatians," demanding they provide financial support for appellants' criminal enterprise and also stating that, if they balked, reprisals would be carried out against them.

Appellant Ranko Primorac headed up the extortion operation in the Los Angeles area, where a number of successful Croatians re-

---

3. Simultaneously, appellants conceived and began the execution of an extortion scheme, alleged to have involved "[i]n excess of fifty individual acts of extortion of victims residing in Manhattan, Westchester, Queens, the vicinity of Chicago, the vicinity of Los Angeles and elsewhere, through letters posted in West Germany, in June, 1978." Indictment SS 81 Cr. 402, ¶ 5. E., *reprinted in* Joint App. at A–57.

4. Mico Jaksic testified at trial under the same terms and conditions as Vjelko Jaksic and Andrija Skrabo, note 2 *supra*.

5. Prior to leaving Canada, Caran had sought and received permission from Ljubas to retain several sticks of the dynamite for use against the Yugoslavian Consulate in San Francisco.

6. Due to an apparent malfunctioning of the device, Caran's attempt to bomb the Yugoslavian Consulate in February, 1978 failed. Caran retrieved the dynamite and kept it in his home, having separated the dynamite from the blasting caps.

sided. Primorac compiled a list of potential wealthy victims, and threatened "to squeeze that [sic] people financially, and if they refuse, to be punished [sic] for example for rest of Croatians." Among other possible targets, Primorac named Steven Bubalo, Krizan Brkic, Marko Zubcic, Frank Striskovitch, and Walter Rasic, all of whom later received extortion letters. The letters demanded that a specified sum of money, generally between $5,000 and $20,000, be mailed to a post office box in Asuncion, Paraguay, or "you will . . . compel us to set a horrible example by making you the first object of the disciplinary rules." Miro Baresic, an unindicted co-racketeer, who participated in the enterprise's affairs during 1977 and 1978, *see infra,* maintained a box in the same postal office.

Having established, and set in motion, the extortion scheme, appellants proceeded on two fronts. First, they continued their bombing activities, as well as trafficking in firearms, committing arsons, and attempting additional murders independent of the extortions. At the same time, they began to carry out reprisals against a number of persons who had failed to heed the warnings in the extortion letters.

In April, 1978, Caran received a telephone call from Los Angeles. The caller instructed Caran to retrieve the explosives he had first stored at Boban's home, and later used in the unsuccessful attempt on the Yugoslavian Consulate, and to deliver them to Primorac and two other men, Miro Biosic and Baresic, in Los Angeles. Skrabo and a man named Ante Sisko delivered the bomb materials on Caran's behalf. After making the delivery, Skrabo joined Baresic, Primorac and several others, and together these men set fire to the Yugoslavian American Club in San Pedro, California.

Several months later, some of the Canadian dynamite turned up on the East Coast. On August 14, 1978, members of the New York City Bomb Squad disarmed and dismantled two bombs which had been placed in a library at the United Nations and in a locker at Grand Central Station. In a communique left with both bombs, a Croatian terrorist group claimed credit for the attempted bombings, and indicated they were intended to protest West Germany's decision to extradite to Yugoslavia one Stipe Bilandzic, a Croatian nationalist and close associate of Ljubas, Markich, and Primorac. The nine sticks of dynamite used in the two New York bombs were Cilgel D7 dynamite, a rare brand, yet precisely the one obtained by Ljubas during the Elliott Lake trip, and bearing the same date code. The electrical tape on the United Nations bomb was discovered to exhibit an "end match" with tape utilized in a bombing of the factory of one of the extortion victims, *see infra,* that is, both bombs were made with contiguous pieces cut from a single roll of black electrical tape.

In mid-1978, Vjelko Jaksic, then residing in Milwaukee, planned a summer vacation in the San Francisco area. Caran asked him to pick up "something," which turned out to be a handgun equipped with silencer which Ljubas had offered to provide Caran. Ljubas had arranged for Bagaric to turn over the gun in Chicago. Vjelko and Mico Jaksic left Milwaukee for Chicago. Upon arrival, they spoke with Ljubas and Bagaric, and were informed that the weapon had been hidden in Markich's apartment. The Jaksics picked up the gun and silencer from Markich. In June, 1978, Vjelko Jaksic went to San Francisco for his holiday, stopping long enough to meet with Caran to deliver the gun and silencer. Caran later tried to use the gun, unsuccessfully, in an attempt to kill the Yugoslavian consul.

Nor did Vjelko Jaksic return to the midwest empty handed. In late May or early June, Primorac had met with Caran in California, and asked Caran to transport weapons to New York. Primorac provided a Westchester telephone number, which Caran was to call upon arrival in the metropolitan area, to be informed of the exact destination for the assorted rifles, machineguns, and ammunition he would be carrying. If Caran were unable to travel to the East Coast, he was to deliver the arsenal to the home of Ivan Misetic in Chicago. As it turned out, Vjelko Jaksic was the courier,

rather than Caran. He brought the weapons to Chicago, en route to his home in Milwaukee. Eventually, the cache made its way to Irvington, a town in Westchester, and to Bridgeport, Connecticut. After Primorac had attempted to use one of the guns to murder a New York critic of the extortion scheme, Joseph Badurina, agents of the Joint Terrorism Task Force seized the weapons from Caran's home in Bridgeport, and from the Irvington home of Ivan Cale and Stipe Ivkosic, associates and fellow terrorists involved in the principal New York based faction of appellants' enterprise.[7]

The violence threatened in the extortion letters began in the fall of 1978, several months after their mailing. On September 28, Westchester businessman Anthony Cikoja, who had received a letter but refused to pay, was shot and killed on his front lawn. Six weeks after Cikoja's murder, Chicago factory owner Danilo Nikolic, who had also received an extortion demand, narrowly missed becoming the second victim when a bomb exploded near the section of his plant where flammable liquids were stored. The bomb used in this attempt was prepared in the identical fashion, using the same roll of electrical tape, as the bombs made of Canadian Cilgel dynamite discovered at the United Nations and Grand Central Station.

In Los Angeles, attacks were carried out on several targets of the extortion scheme. Just after Labor Day, 1978, Primorac had asked Caran to leave his work in Sacramento for one week, to kill one Mario Forgiarini, a wealthy recipient of an extortion letter. Three weeks later, Primorac's roommate, Miro Biosic, met Caran at the Los Angeles airport, and after informing Caran that Primorac had decided to remain out of town because "he don't [sic] want to be around if anything is happening," handed Caran a gun and silencer and drove him to Forgiarini's house. Forgiarini never appeared. Despite Caran's failure to carry out the attempt on the life of Forgiarini, Primorac paid him the $700 week's wages Caran lost.

In November, 1978, Caran moved to Los Angeles. There, he was introduced by Primorac to another Croatian named Marijan Rudela. Acting on Primorac's instructions, Rudela asked Caran to assist him in murdering Forgiarini. This time, Caran declined, apparently having decided the proper approach was to "kill some Yugoslavs, some enemy of our people, not the Croatians." Caran did not balk several days later, however, when Rudela suggested an alternative target, Marko Zubcic, another successful businessman who had been the recipient of an extortion letter. Caran and Rudela waited near Zubcic's place of business, intending to ambush him, but Zubcic never emerged.

The next morning, Rudela suggested yet another victim, Krizan Brkic. Rudela drove to Brkic's residence and handed Caran the same gun and silencer that had previously been provided Caran by Primorac's roommate, Biosic, for the unsuccessful attempt on Forgiarini. Caran hid in bushes outside Brkic's home, and when Brkic appeared in the yard, Caran shot and killed him.

Over the next several months, a new form of violence was employed against the Los Angeles victims. On April 6, 1979, identical pipe bombs, constructed to explode upon impact and scatter metal shrapnel, caused property damage to the homes of Forgiarini and Frank Striskovitch, both of whom, along with Brkic and Zubcic, had been threatened by Primorac. On May 23, 1979, Rudela and another Croatian were killed in the process of arming yet another pipe bomb which detonated prematurely. At the time, Rudela was sitting in an automobile parked seventy feet from the home of extortion victim Martin Balov. According to Bagaric, "We had made a mistake."

In 1979, appellants conceived of still an additional reprisal tactic, the mailing of "book bombs," that is, hardcover books hollowed out, filled with a stick of dynamite and a blasting cap, and wired in such a

---

7. Cale and Ivkosic were convicted, along with Caran and several others, in the earlier trial before Judge Pollack. The RICO convictions of Cale, Ivkosic, Franjo Ivic, and Nedjelko Sovulj have since been reversed. *See* Part II *infra*.

fashion that the two naked wire ends would join as the book was opened, setting off a powerful explosion designed, in the words of Richard M. Rogers, a special agent examiner in the FBI Explosives Unit, simply "to kill a human being."

On February 19, 1979, two of these book bombs were mailed, from Akron, Ohio, to Joseph Badurina, a Queens, New York journalist, and Father Timothy Majic, a Catholic priest in Milwaukee. Both men were Croatian nationalists, of significant influence in their home communities, who had taken explicit and adamant editorial positions against the use of violence. Remarkably, Father Majic was being interviewed by an FBI agent on the morning of February 26, when his mail arrived. The agent, seeing the priest about to open the cover of a black book and observing what appeared to be wires inside, seized the book instantly and threw it into a snowbank in the church courtyard. A police officer from the Milwaukee bomb squad separated the blasting cap from the dynamite, losing part of his hand in the process.

One week later, Badurina received a similar package. Aware of the unsuccessful attempt to kill Majic, Badurina alerted the FBI. The New York City bomb squad removed the package and disarmed the book.

On April 4, detectives of the Cleveland Police Department obtained a warrant and searched the residence of appellant Vinko Logarusic. The search turned up a metal toolbox containing more than eight hundred rounds of ammunition and batteries, as well as a hollowed out book containing wires, a battery and a light bulb. This book, described by an FBI expert as the "prototype, or perhaps test book, which was manufactured prior to the other two book bombs," was the same size as the ones mailed to Badurina and Father Majic, with a depth of exactly one and one-half inches, permitting a stick of dynamite to be placed flat inside. The glue in all three books was of the same chemical composition, the wire was the same gauge, the wires in all three were twisted into loops and L-shaped hooks, and, finally, all three books employed solder,

rather than standard battery connectors, to hook the wire to the power source. Laboratory tests showed the same pair of pliers had been used to cut a wire in the bomb sent to Badurina and the one found in Logarusic's home.

In August, 1979, Caran moved his family to Bridgeport, Connecticut. That autumn, he was approached by Ljubas in the Croatian Center in Manhattan. Ljubas asked whether Caran would be interested in learning to make bombs and teaching others, apparently primarily for use in Europe but in this country as well. Caran assented. Several months later, Caran was telephoned at work by appellant Drago Sudar, who informed Caran he had been sent by Ljubas. After Caran picked up Sudar at the Croatian Center, the two men drove to Fairfield, Connecticut to purchase wires, a clock, a soldering iron, and gloves. From there they went to the apartment of a friend of Caran's in Bridgeport, where Sudar taught Caran how to put together a time bomb.

Caran's lesson could not be completed, however, because the two men had been unable to purchase blasting caps in Fairfield. Several weeks later, Ljubas, who had come to the East Coast, offered to have blasting caps delivered to Caran (as well as arranging for Caran to be paid $2,000 to travel to Europe to pass on the skills he had acquired from Sudar). On July 5, 1980, Bagaric's wife delivered to Caran, at the latter's Bridgeport home, two blasting caps.

In September, 1980, Sudar returned to Bridgeport to resume the bomb construction lessons. After detailing his recent trip to California to teach bombmaking to other Croatians (including the brother of Marijan Rudela), Sudar described to Caran "how to make bombs in the drawer, in the door, in the car, and in the book. In the book . . . is most dangerous, you got to be very, very careful to make a bomb." Sudar demonstrated to Caran the preparation of time bombs.

On June 25, 1981, Sudar was arrested at his home in Toronto, Canada, on an extradition warrant. Detectives of the Peel Re-

gional Police Department searched his home, discovering and seizing a watch, batteries, light bulbs for automobile directional signals, tape, and coiled and color coded wires. One of the nine-volt batteries seized had its terminals filled with solder, in a manner similar to that used in the book bombs from the United Nations, Grand Central Terminal, and Logarusic's home.

*The Indictment, Racketeering Counts and Trial*

By indictment S 81 Cr. 402, superseding and consolidating two earlier instruments and filed on June 30, 1981, Bagaric, Markich, Ljubas, Logarusic, Primorac, and Sudar were charged with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[8] Count One charged conspiracy to violate the racketeering statute, 18 U.S.C. §§ 1961, 1962(d), and Count Two alleged a substantive violation, *id.* §§ 1961, 1962(c).[9] On July 8, the United States Government filed with Canadian authorities an application for the extradition of Sudar, and on September 11, a warrant of committal was entered by a Canadian court, ordering Sudar's extradition on Count One of S 81 Cr. 402 only. On July 28, a second superseding indictment, SS 81 Cr. 402, had named all appellants in the same two counts as S 81 Cr. 402. But, as Sudar had been formally extradited on S 81 Cr. 402, he could not be tried on SS 81 Cr. 402. Accordingly, on January 21, 1982, the district court ordered consolidation of the two indictments, Fed.R.Crim.P. 13; *see United States v. Halper,* 590 F.2d 422, 428–29 (2d Cir.1978).[10]

Trial commenced on February 16, 1982, and continued for thirteen weeks. On May 15, after approximately six days of deliberations, the jury returned guilty verdicts on both counts against Ljubas, Markich, Primorac, and Bagaric. Sudar was convicted of the single conspiracy count on which he was tried. Logarusic was convicted of conspiracy and acquitted on the substantive offense. The district court sentenced Ljubas and Primorac to terms of imprisonment of twenty years on each count, to run consecutively. Markich and Bagaric received prison terms of twenty years under Count One and ten years under Count Two, such terms also to be served consecutively. Logarusic and Sudar were both sentenced to terms of imprisonment of twenty years on

---

**8.** Also named, and eventually acquitted, were Andjelko Jakic, Ivan Misetic, Miro Biosic, and Mile Boban.

**9.** The relevant portions of RICO provide as follows:

§ 1961. Definitions

As used in this chapter—

(1) "Racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under ... the following provision[] of title 18, United States Code: ... section 1952 (relating to racketeering) ...;

(2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, or any union or group of

individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

. . . .

§ 1962. Prohibited activities

. . . .

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection[] ... (c) of this section.

**10.** Sudar's claim that Judge Motley erred in consolidating the two indictments is discussed *infra.*

the conspiracy count. All convicted defendants have appealed, raising a multitude of contentions.

## II

The difficult threshold question posed for consideration is whether, in light of our recent decision in *United States v. Ivic, supra,* the conduct charged in the indictment and proved at trial constituted an offense under RICO. In *Ivic,* a panel of this court concluded that a prosecution may not properly be brought pursuant to § 1962(c) when the Government does not charge that either the enterprise, 18 U.S.C. § 1961(4), or the predicate acts which make up the alleged pattern of racketeering activity, *id.* § 1961(1), (5), possess some financial purpose. *United States v. Ivic, supra,* at 64. In this case the charges and proof all relate to a terrorist organization, "motivated" [11] by political as well as economic goals, and claimed to have engaged in economic crimes "to obtain money to further [its] activities," *id.* at 61 n. 6 (reserving issue of applicability of RICO to such cases). We are called upon to decide whether this case, falling somewhere between the complete absence of financial purpose or activity, on the one hand, and an enterprise engaged solely in siphoning monies from, and infiltrating, legitimate businesses, *e.g., United States v. Scotto,* 641 F.2d 47 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), on the other, is within the purview of RICO. For several reasons, we conclude it is.

## A

█ Relying on isolated language in *Ivic,* appellants argue the Government is required to prove an ultimate and overriding financial motive to secure a RICO conviction. The *Ivic* court nowhere stated, however, that economic gain must be the sole motive of every RICO enterprise. Such a rule, we believe, would run counter to fundamental principles of criminal law and risk the politicization of criminal trials. We reject appellants' contention.

Although evidence of motives or purposes underlying criminal behavior is normally admissible, provided certain criteria of reliability are met, Fed.R.Evid. 404(b); *United States v. Figueroa,* 618 F.2d 934, 939 (2d Cir.1980); *United States v. Houlihan,* 332 F.2d 8, 15 (2d Cir.) (financial motive), *cert. denied,* 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964), motive itself is not generally an element of a particular offense. *Compare United States v. Pomponio,* 429 U.S. 10, 11, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976), *with United States v. Cioffi,* 493 F.2d 1111, 1119 (2d Cir.), *cert. denied,* 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974). And, when Congress has required proof of motive, it has generally done so for behavior not deemed blameworthy absent the immoral motive, and not otherwise punishable. So, for example, it may be permissible under various circumstances to communicate with a judge to offer mitigating information relevant to sentence, *e.g., United States v. Fasolino,* 449 F.Supp. 586, 587 (W.D.N.Y.), *aff'd,* 586 F.2d 939 (2d Cir.1978), but "an endeavor to exploit" a friendship with the judge may be found to be a "corrupt" motive, 586 F.2d at 941 (18 U.S.C. § 1503).

RICO demands no such inquiry. The offenses it proscribes are, in the main, activities punishable irrespective of motives for performance, and accordingly they are provable by showing mens rea in the typical fashion. Hence, no additional scienter requirement is imposed by the statute. *Unit-*

---

11. We purposely highlight our use of the word "motivated." As the text makes clear, we are troubled by the notion, advanced by appellants, that the Government will be required to prove the animating or long-run objective of a RICO enterprise was economic, apparently to the exclusion of other, collateral "motives."

It is clear that § 1962 does not, by its terms, require proof of ultimate improper economic motive, as does, for example, 18 U.S.C. § 1503

("corrupt" motive to obstruct investigation). We think it simplifies matters to state at the outset our belief that the term "motive" has been used imprecisely throughout these proceedings, as it suggests an inquiry into mens rea. *See* text *infra.* The issue is whether an objective assessment of the crimes charged and proved in this case demonstrates an economic dimension sufficient to bring them within the language and intention of § 1962.

ed States v. Boylan, 620 F.2d 359, 361–62 (2d Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). To carry out a deeper inquiry into long-term or ultimate motive would be to require adjudication of a factor traditionally deemed not exculpatory. E.g., United States v. Starks, 515 F.2d 112, 124 (3d Cir.1975) (Hobbs Act applies to extortions committed for religious "purposes"), aff'd sub nom. Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); United States v. Cullen, 454 F.2d 386, 392 (7th Cir.1971) (Stevens, J.) ("Appellant's professed unselfish motivation, rather than a justification, actually identifies a form of arrogance which organized society cannot tolerate."). Moreover, such an exercise would embroil courts and jurors in a controversy essentially irrelevant to the purpose of the statute under consideration. Whether appellants extorted money for the long-term political purpose of effecting the separation of Croatia from Yugoslavia, whether this formed part, but not all, of their "motivation," or whether the freedom of their former province is an issue they care about not at all, the effect of their activities on the national economy is identical. The Ivic court described RICO as a device to prevent (and reverse) "the drain[ing of] billions of dollars from America's economy by unlawful conduct," United States v. Ivic, supra, at 62. This effect is accomplished whatever considerations compel the creation and execution of an extortion scheme.

RICO's liberal construction provision, Pub.L. No. 91–452, § 904(a), 84 Stat. 922, 947, was deemed irrelevant in Ivic, "since . . . construing RICO to cover terrorist activities . . . would in no way 'effectuate its remedial purposes,'" id. at 65 n. 8, where there is no allegation or proof the enterprise's "activities generate monies which can serve as a 'springboard into the sphere of legitimate [business],'" id. at 63. In the case before us today, it is clear that, irrespective of the motive which appellants would have us believe spurred them to action, the remedial purposes of RICO are directly implicated. Pursuant to the direction of section 904(a), we decline to add an element of proof which would hamper the effective implementation of the statute.

Further, investigation into motive would serve only to politicize, and otherwise inflame, RICO prosecutions. As discussed in greater detail infra, defense counsel sought to inject peripheral political and religious considerations into the trial of this case, implying that appellants' anti-Communism or Catholicism, or their persecution by American and Yugoslavian officials acting in concert, justifiably drove them to commit the acts of extortion and violence charged in the indictment. These suggestions— which ultimately formed no part of the defense case of appellants who testified or presented witnesses—were, viewed charitably, misguided. They can only have served to patronize the jury and to add a distracting element of emotionalism to the proceedings.[12] An interpretation of RICO requir-

---

12. In response to appellants' opening statements, the Government's chief prosecutor drafted, and asked the court to issue, an order which would have precluded reference to (1) religious beliefs and convictions, see Fed.R. Evid. 610; Virgin Islands v. Petersen, 553 F.2d 324, 329 (3d Cir.1977); (2) foreign policy issues; (3) activities of foreign sovereigns not related to specific proof that "a foreign government had some involvement in the performance of an act of racketeering in this country that is charged in [the] indictment, or unless the defense counsel has competent proof that a foreign government has some involvement with one of [the government's] witnesses," Tr. 189; and (4) hearsay newspaper or magazine articles. Judge Motley declined to issue such a "blanket" preclusion order, preferring to rule

on the admissibility of individual items of evidence as they were offered. This course was proper. Although much of what appellants' counsel had to say bore no relation to any theory of defense or the crimes charged, there was at least a question whether some remarks would prove relevant. For example, Ljubas's trial attorney stated:

> We will show that Mr. Ljubas did do a lot of traveling, he made a lot of speeches throughout the world on behalf of an independent Croatian [sic] to get away from Communist Yugoslavia. You will hear testimony that there are millions and millions of Croatians throughout the world. You will hear testimony that there were over a million that came to this country to escape the Communist regime in Yugoslavia.

ing proof of long-term pecuniary objectives which in some sense can be said to supersede accompanying political or religious ones would invite a repetition of this conduct. It would authorize the admission of evidence of political beliefs, racial animosities, and family and blood feuds as justifications for criminal acts. Because we believe Congress, and the traditions of our criminal law, contemplate trials free of consideration of such issues, we reject appellants' argument that economic motive must surmount all others.

### B

Appellants appear to argue also that the enterprise itself, rather than the predicate acts of racketeering, must be shown to yield financial gain. This contention is supported neither by a careful reading of the *Ivic* opinion nor by reference to the underlying purposes of RICO.

The literal terms of the narrow *Ivic* holding require no more than an objective appraisal that some economic purpose was to be accomplished by the crime charged: "We hold that when an indictment does not charge that an enterprise *or* the predicate acts have *any* financial purpose, it does not state a crime under [RICO]." *Id.* at 65 (emphasis supplied). Additionally, this court has recognized that the nature of the misconduct often provides the best clue toward defining the enterprise. We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts. *United States v. Mazzei,* 700 F.2d 85 at 88–89 (2d Cir.1983); *United States v. Errico,* 635 F.2d 152, 156 (2d Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981); *United States v. Altese,* 542 F.2d 104, 106 (2d Cir.1976) (per curiam),

Tr. 43.
There will be testimony that Mr. Ljubas did a lot of traveling on behalf of Croatia, to free Croatia from the Communists. The testimony will be that he went to Sweden .... he wasn't even in Germany, in West Germany in '78, '79, or '80.
Tr. 44.
This could have been intended to indicate Ljubas would present evidence to rebut the Government's theory he travelled, in 1977, to West Germany, where he met with other Croatians and devised the extortion scheme. *See* Tr. 3306–07 (testimony of Government witness Andrija Skrabo). And Ljubas's testimony appears to amount to a denial he was even permitted to enter West Germany in 1977. *See* Tr. 8014–15 (direct testimony of Ljubas):

Q Did you ever have any problems while traveling in West Germany?
A Only one time I had a problem with the West Germany and the border.
Q When was that, what year?
A 1977.
Q What happened?
A Well, on—I was in France, in Lourdes, and after I was in Spain and Lourdes, France, so I was stopped on the border. And so they—they look in the book and they find my name and they said that they going to—that we stop from the train, in the train station.

\* \* \* \* \* \*

A ...
After all this ... they return me back to France and that's it.
*But see* Tr. 8086–87 (cross-examination of Ljubas):

Q Tell me, sir: When was the first time you visited with Mr. [Stipe] Bilandzic [a Croatian nationalist extradited by the German government to Yugoslavia] in West Germany?
A It could be ten years ago.
Q When was the second time you visited Mr. Bilandzic in West Germany?
A I don't remember.
Q Did you visit him in 1977, Mr. Ljubas?
A Yes, sir.
Q And I think on direct examination you described your trip to Europe when asked about it by [Ljuba's trial counsel]; is that correct?
A Yes. .
Q And you explained how the West German authorities questioned you late at night one night?
A Yes, sir.
Q Was that on August 24, 1977, Mr. Ljubas?
A Yes, sometime in August, right.
Q Does that date appear to be correct to you, Mr. Ljubas, August 24, 1977?
A Could be correct, yes. Sometime in August.
Q And did you inform the German authorities—by the way, what town was this, Mr. Ljubas, do you remember?
A Oh,—
Q Was it at the town of Forbach in West Germany?
A No, it was different. It was on French and German border, small town.

*cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977). These decisions reflect the common sense recognition that a group of individuals may join together, and therefore be "associated in fact," § 1961(4), although not a legally cognizable entity in one of the traditional forms, *id.,* solely for the purpose of conducting their activities. That is, it is logical to characterize any associative group in terms of what it *does,* rather than by abstract analysis of its structure. *See also United States v. Chovanec,* 467 F.Supp. 41, 44–45 (S.D.N.Y.1979) (enterprise need not be a group having characteristics of "organized crime," since Congress enumerated acts "with no restrictions limiting [RICO] to persons with particular affiliations"); *United States v. Vignola,* 464 F.Supp. 1091, 1095–97 (E.D.Pa.) (same), *aff'd without opinion,* 605 F.2d 1199 (3d Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); *cf. United States v. Roselli,* 432 F.2d 879, 885–86 (9th Cir.1970) (rejecting contention that "business enterprise," 18 U.S.C. § 1952, reaches only "business[es] . . . associated with or controlled by a clandestine criminal organization").

Moreover, even where the enterprise is one of the legal entities listed in § 1961(4), and proof of that element diverges from the proof of a pattern of racketeering, we think the requisite economic dimension may be demonstrated through the latter. Section 1961(4) appears to contemplate application of RICO to enterprises which, for example, are not themselves profit-making, or reinvest all their funds. *Cf. United States v. Turkette,* 452 U.S. 576, 580–81, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (in § 1961(4), use of word "any" in clause dealing with unions and individuals associated in fact signals congressional intent to impose no restriction upon associations embraced by definition; illegitimate associations therefore included); *United States v. Angelilli,* 660 F.2d 23, 30–31 (2d Cir.1981) (New York City Civil Court held a RICO "enterprise;" use of word "any" indicates intent to make list all-inclusive, and "any being whose existence is recognized by law is within the term 'enterprise' "), *cert. de-*

*nied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982). The situation reached by § 1962 may thus not always be one in which the enterprise "makes money" for its members. Yet, even absent a requirement that the enterprise be a profit-making one, the section implements the principal congressional purpose, "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce," S.Rep. No. 617, 91st Cong., 1st Sess. 76 (1969), in two significant ways. First, by "striking at the source of the problem," *United States v. Turkette, supra,* 452 U.S. at 593, 101 S.Ct. at 2533, that is, proscribing the racketeering activities demonstrably capable of providing "a springboard into the sphere of legitimate enterprise[s]," *id.* at 591, 101 S.Ct. at 2533, whether "profit-making" or otherwise, Congress sought to make RICO preventive as well as remedial. Second, since non-profit corporations (as well as entirely illegitimate associations of individuals, *see id.* at 588–93, 101 S.Ct. at 2531–33; *United States v. Mazzei, supra,* at 88–90) compete within the economy for funds and services, it would have been counter-productive to exempt from the statute those invested in, acquired, or maintained through a pattern of racketeering activity.

Accordingly, the Government may meet its obligation to show "financial purpose" through either the enterprise or the predicate acts of racketeering.

We recognize that, read in isolation, language in *Ivic* can be taken to support a requirement that, quite apart from the nature of the predicate acts, the enterprise itself must be "the sort of entity one joins to make money." *United States v. Ivic, supra,* at 60. The court noted the usage of "enterprise" in other parts of § 1962, concluded it referred to "the sort of entity in which funds can be invested and a property interest of some sort acquired," *id.,* and applied the same definition to subsection (c). Initially, we note this language is dictum, and differs from the holding of the case, which stated only that because *neither* the acts charged *nor* the purpose of the enterprise was economic, the indictment was outside the scope of § 1962(c). More

significantly, the context in which it was employed persuades us the panel had no intention of insisting the necessary showing of economic purpose be confined to the enterprise.

*Ivic* involved a group of individuals associated in fact. That phrase is defined in the portion of § 1961(4) designed to bring within § 1962 the commission of criminal acts related, in any one of several ways, 18 U.S.C. § 1962(a), (b), (c), to enterprises with ascertainable associative structures but not one of those enumerated in the other part of § 1961(4). *See, e.g., United States v. Huber,* 603 F.2d 387, 394 (2d Cir.1979) (group of corporations not legally related may be "group of individuals associated in fact;" otherwise "[o]ne could simply transfer assets from the corporation whose affairs had been conducted through a pattern of racketeering activity to another corporation whose affairs had up to that point not been so conducted"), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 758 (1980). If the statute did not include this definition of enterprise, there might occur "the anomolous [sic] result that a large scale underworld operation which engaged solely in trafficking of heroin would not be subject to RICO's enhanced sanctions, whereas

small-time criminals jointly engaged in infrequent sales of contraband drugs and illegal handguns arguably could be prosecuted under RICO." *United States v. Mazzei, supra,* at 89. And, as noted, we have sanctioned RICO prosecutions where the enterprise and the predicate acts of racketeering, although of course separate and necessary elements of § 1962(c), need not be proved by distinct and independent proof. The *Ivic* panel's consideration of the meaning of "enterprise" in subsections (a) and (b) therefore amounted to no more than support for its ultimate conclusion that economic purpose must be shown in *either* the proof of enterprise *or* the proof of predicate acts. In *Ivic,* the two were functionally equivalent, and "the proof used to establish [them] . . . coalesce[d]," *United States v. Turkette, supra,* 452 U.S. at 583, 101 S.Ct. at 2528. The problem for the Government was that no proof established (nor did the indictment allege) that the group's "activities [were] designed to obtain, [or] in fact yield[ed], any money whatsoever." *United States v. Ivic, supra,* at 63.[13]

### C

■ This case fits well within the principles we have enunciated. The core of the

---

**13.** Other factors, relied upon in *Ivic,* comport with this reading. The title of the statute, "Racketeer Influenced and Corrupt Organizations," *see United States v. Ivic, supra,* at 61, insofar as it "may furnish some aid in showing what was the mind of the legislature," *United States v. Palmer,* 16 U.S. (3 Wheat.) 610, 631, 4 L.Ed. 471 (1818), supports inclusion of terrorist groups which finance their violent activities through extortionate means. "Corrupt" is defined in Webster's New Collegiate Dictionary (5th ed. 1977) as "characterized by bribery, the selling of political favors, or other improper conduct." Even more directly on point, a "racketeer" is "one who extorts money or advantages *by threats of violence,* by blackmail, or *by unlawful interference with business or employment*" (emphasis supplied). Precisely these tactics were employed by appellants.

Similarly, the statement of findings which prefaces RICO evinces an intent to put a halt to the "widespread" illicit operation of groups, made more powerful by the sophistication and diversification which accompany organization. Their activities were said to "drain[ ] billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and

corruption." Apart from the reference to "organized crime," an amorphous concept popularly associated with groups different from the one in the instant case, but not meant to limit applicability of the statute to persons within its ranks, *see, e.g., United States v. Vignola, supra,* and other cases cited, this description of congressional concern clearly covers the conduct of appellants in this case.

Finally, the contention advanced at oral argument by Ljubas's counsel, that because Congress was primarily concerned with the "infiltration" of legitimate businesses, the Government must prove more than either the potential for such penetration or the diversion of monies from the legitimate sphere, has been rejected by this court, *United States v. Barton,* 647 F.2d 224, 227 (2d Cir.) (struggle between rival illegal underworld factions to gain control of unlawful enterprises), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), and, in a slightly different context, by the Supreme Court, *United States v. Turkette, supra,* 452 U.S. at 593, 101 S.Ct. at 2533 (wholly illegitimate criminal organizations whose "activities . . . give rise to . . . concerns about infiltration" within RICO).

enterprise was the commission of more than fifty acts of the classic economic crime of extortion, and many of the violent crimes perpetrated were in aid of the extortion scheme. They were carried out either to compel payment or in retaliation for refusal to meet appellants' extortionate demands. Indeed, the Assistant United States Attorney said in his opening statement to the jury that appellants sought to extort money from "moderate Croatians [to] help finance [their] criminal enterprise," and emphasized that "this extortion scheme ... is one of the centerpieces of this criminal case." The first ten Government witnesses were extortion victims or widows of murdered extortion victims and proof of economic crimes continued throughout the lengthy trial.

The indictment and proof in this prosecution were consistent with the language and purposes of RICO. We decline to impose upon the Government an obligation to show pure or ultimate economic motive in any of the various formulations urged by appellants. Although we have previously noted, *United States v. Huber, supra,* 603 F.2d at 395–96, and we repeat the admonition here, "that the potentially broad reach of RICO poses a danger of abuse [when the statute is] appl[ied] ... to situations for which it was not primarily intended," our obligation is "to rule on actual, as opposed to hypo-

thetical, applications of the statute," *United States v. Weisman,* 624 F.2d 1118, 1123 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980), and it is clear to us that the present one was appropriate.

### III

Numerous claims unrelated to the *Ivic* issue have been advanced. We shall first consider those applicable to all appellants.

#### Prosecutorial Misconduct

Alleging repeated and persistent instances of improper prosecutorial comment, appellants claim they were deprived of a fair trial. They challenge a number of statements as derogatory of defendants or their counsel, as injecting into the trial the prosecutor's personal belief the defendants were lying, or as exceeding the appropriate bounds of cross-examination. Although appellants have fashioned a superficially impressive compilation of alleged misconduct, and although some remarks by the Government were perhaps ill-advised,[14] when read in the context of the entire record of this thirteen-week trial, *United States v. Socony Vacuum Oil Co.,* 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940); *United States v. Bivona,* 487 F.2d 443, 446–47 (2d Cir.1973); *see United States v. White, su-*

14. For example, we have disapproved the use of the terms "preposterous" and "lie" to characterize the testimony of defense witnesses, also used by the Assistant United States Attorney in this case. *United States v. Drummond,* 481 F.2d 62 (2d Cir.1973). In *Drummond,* however, we were compelled to reverse the conviction only because of the cumulative effect of a series of flagrant abuses. The prosecutor had been warned by the district judge in the first trial of the same case that his conduct approached impropriety, and he repeatedly vouched for the credibility of the Government's witnesses and indicated his disbelief of defendant's witnesses during cross-examination "with such statements as 'were you lying then or now?',—'Were you lying at that time?'—'Was that the truth or is this the truth?'—'Have you now changed your story three times?'" *id.* at 63. The Assistant attempted to inform the jury that mere association with the Government guaranteed the credibility of one of its witnesses, and he misrepresented testimony and evidence adduced at trial (alone creating a pre-

sumption of prejudice, *id.* at 64 (citation omitted)). "[T]he combination of [these factors left] us no other course [but to reverse]." *Id.*

The conduct of the prosecutor in this case does not begin to approach the egregious behavior we have held sufficient to require reversal, as our discussion in the text makes clear. But, while we recognize the need for language which is "blunt and to the point," *United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974), we reiterate our often expressed admonition that prosecutors have an obligation to avoid statements which may have the effect of appealing to the jury's emotions, *e.g., United States v. Marrale,* 695 F.2d 658, 667 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1434, 75 L.Ed.2d 793 (1983), and we reject the Government's contention that "there is no meaningful distinction between the word 'lie' [and] its more genteel synonym, 'falsehood,'" Brief for the United States at 60 n.*. *See United States v. White,* 486 F.2d 204, 206 n. 8 (2d Cir.1973), *cert. denied,* 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974).

*pra,* 486 F.2d at 206 (prejudice less likely in "long and hotly contested trial"), the Government's statements did not prejudice appellants' right to a fair trial.

The Assistant's opening remarks to the jury were concise and free of rhetoric. Apart from a single remark that this case "is important ... because the office [the prosecutors] represent is responsible for enforcing ... federal laws," into which appellants manage to read an appeal to the jury's patriotism, the prosecutor adhered closely to the facts and indictment. He ended by asking the jury to

> approach your responsibilities as jurors in this case in the spirit of the utmost seriousness and fairness.
>
> ... I urge you to listen carefully as the proof is presented in this case. Again, I remind you to be patient, that only one witness can testify at a time. I am confident that you are going to do that and I am equally confident that you are going to see that the defendants on trial here have a fair trial.

In marked contrast, appellants' counsel began, before a single witness had testified, to interject extraneous and potentially inflammatory considerations into the proceedings. Ljubas's trial attorney, for example, told the jury that Ljubas was the victim of "the Communists and the Secret Police of Yugoslavia, which was trained by the Russian Secret Police;" "that attempts [on Ljubas's life] were made by the Communist Secret Police known as UDBA, which is the Communist Secret Police of Yugoslavia that has agents throughout this country and in various Yugoslavian embassies throughout this country;" "that [Ljubas] was [in Rome in 1970] as a devout Catholic;" and that "[t]he first Croatian Saint was canonized by the Catholic Church in 1970 and there were many Croatians that went to Rome." The Government's witnesses, yet to testify, were characterized as "traitors, double agents, or Communist Secret Police, trying to infiltrate and destroy people in good standing." This collection of statements reflects the substance of the entire opening, which takes up only five pages in the transcript.

The second defense counsel, representing Markich, continued this approach. Markich was labelled a victim of the "Yugoslavian Police." Counsel then implied the Government's case served only to advance goals of the Yugoslavian Secret Police force:

> ... You are going to hear how [Markich] is victimized. You are going to hear about the entire story, why he is here.
>
> Now, [Ljubas's trial counsel] has told you about the Secret Police. That's going to be part of this entire trial. It's going to be part of it from the beginning to the end. You are going to hear it from the government's own witnesses, about the Yugoslavian Police, and what they do and how they do it and how they get their goals, and the object of those individuals who are here or over there are to suppress the people who speak out for freedom. That is the greatest crime of Mr. Markic [sic].

Counsel for Primorac ended his, also brief, opening with the following:

> I submit to you that [Primorac] wasn't part of any conspiracy or criminal enterprise of worldwide or local or of any import, but rather that he is himself a victim of political persecution, and unfortunately the evidence will show that the United States Government through the offices of [the two prosecutors] is being used to persecute this man, and this is being done by a foreign country, a communist country, if you will.

Each of the remaining defense attorneys engaged in similar conduct, including references to political or religious persecution in Yugoslavia and the alleged victimization of their clients in this country. More than oblique hints were given that the United States Government was acting at the behest of officials in Belgrade:

> Somehow [Logarusic] has been put into the [prosecution], either by the government informant or by the government itself or God knows, and somebody said, by the secret police. And if you think that was made up, listen carefully to the evidence in this case, because more things

go on in this heaven and earth than you would suspect, especially in a case that involves foreign countries and American foreign policy and our relationships with European countries and communist countries in 1982, in 1981, in 1980.

Thus, from the first, defense counsel sought to put in question the legitimacy of this prosecution and the Government's reasons for pursuing it, as well as presenting irrelevant and potentially prejudicial political and religious matters. We have repeatedly held that the Government is ordinarily permitted to respond to arguments impugning the integrity of its case, *e.g., United States v. Miller*, 478 F.2d 1315, 1318 (2d Cir.), *cert. denied*, 414 U.S. 851, 94 S.Ct. 144, 38 L.Ed.2d 100 (1973), and to "reply with rebutting language suitable to the occasion." *United States v. Praetorius*, 622 F.2d 1054, 1061 (2d Cir.1979) (citations omitted), *cert. denied*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). We thus consider the specific categories of alleged prosecutorial conduct, mentioned above, as having occurred in the unfortunate context of appellants' own making. *United States v. LaSorsa*, 480 F.2d 522, 526 (2d Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973).[15]

The instances where the prosecutor is alleged unfairly to have engaged in name-calling or disparagement of defendants all constitute fair comment. For example, references to appellant Ljubas as a "man of peace" or "the Croatian Albert Schweitzer" were direct responses to defense counsel's effort, on direct examination, to portray Ljubas as a religious figure whose sole diversions were participation in the affairs of his church and religious pilgrimages. The Government had a right to rebut this defense tactic, *cf. United States v. Marrale, supra*, 695 F.2d at 667 ("permissible desire to dispute defense histrionics"), and the use of rhetorical devices such as sarcasm was permissible, *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *DiCarlo v. United States*, 6 F.2d 364, 369 (2d Cir.) (L. Hand, J.) ("To shear [the prosecutor] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; it is to deny what has always been an accepted incident of jury trials, except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted."), *cert. denied*, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925).[16]

15. Defense counsel did not, during the course of trial, waver from a willingness to employ improper tactics. We will not catalogue examples. We confine ourselves to noting that 1) the Government several times suggested techniques which might prevent the proceedings from degenerating completely, including the proposed protective order, *see* note 12 *supra*, and, to avoid strident attorney colloquies in front of the jury, a practice of writing out objections for presentation to the judge rather than arguing in open court; and 2) while the Government did not hesitate to use strong language in characterizing the credibility of the testimony presented by the defense, it never resorted to the use of such terms as "dangerous, sick, vicious people," "pathological liar," "garbage," and "raving maniac," to choose several especially colorful examples employed by defense counsel to describe Government witnesses. *See United States v. Fernandez*, 480 F.2d 726, 741–42 n. 23 (2d Cir.1973).

16. To the extent the prosecutor on rare occasions expressed his frustration, he was responding to the atmosphere created by appellants. For example, we are directed to an in-

stance when the Assistant referred to cross-examination of a Government witness as "McCarthyism translated to 1980." Appellants neglect to inform us, however, that this outburst occurred only after the witness had been asked, or counsel had tried to ask, whether he was "pro-Russian" or "pro-Communist," whether he had edited a Socialist newspaper, whether he had written a book which had a red cover, whether he had written for a magazine which displayed—along with pictures of Gerald Ford—pictures of Lenin and a hammer and sickle, and whether he had written for a publication which used red colors. The Assistant repeatedly objected to this line of questioning. Ultimately, Judge Motley agreed the witness and prosecutor had been provoked by defense counsel, and denied an application for a mistrial based upon the "McCarthyism" comment. We will not overrule this decision, absent a demonstration the district court was not "in a better position than we to evaluate subtle behavioral defense tactics," *United States v. Marrale, supra*, 695 F.2d at 667.

Similarly without merit is the contention the prosecutor relied on the prestige of his office to improperly vouch for the credibility of the Government's case, or attack that of the defense. The long list of examples of alleged misbehavior is not only lifted from the cold record of an eleven-hour summation which comprises over three hundred transcript pages, *see United States v. White, supra,* 486 F.2d at 206, but it includes only one statement which arguably implied the existence of extraneous proof, or of a requirement that special credence be accorded the office of the United States Attorney, *United States v. Modica, supra,* 663 F.2d at 1179. All other arguments and characterizations were confined to the proof, and were "fairly based on record evidence." *United States v. Canniff,* 521 F.2d 565, 571 (2d Cir.1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976).

The cross-examination techniques employed by the Assistant were also proper. Characterizations of Ljubas as "a man of peace" already have been discussed. And supposed attempts to compel defendants to rebut the veracity of the Government's witnesses in fact amounted to no more than requests that they characterize testimony already in evidence, concerning events in which they were alleged to have participated, as accurate or inaccurate. Indeed, on direct examination, the same or similar questions were asked.

■ In sum, although we believe the Government would have been better advised to avoid entirely the use of words and phrases such as "lie," "preposterous," "sham," and "insulting to [the jury's] intelligence," *but see United States v. Hysohion,* 439 F.2d 274, 277–79 (2d Cir.1971), its conduct here was largely responsive to the prosecutor-baiting tactics chosen by appellants, and involved almost exclusively characterizations of record testimony rather than appeals to Government expertise or extrinsic, unutilized evidence. Viewed in context, the Government's remarks constituted fair argument, and if errors were committed, they were neither significant

nor did they prejudice appellants. *United States v. Socony Vacuum Oil Co., supra,* 310 U.S. at 239–40, 60 S.Ct. at 851–52. The jury's discriminating acquittal of four defendants (and partial acquittal of Logarusic) demonstrates it was able to rely on the evidence adduced. *United States v. White, supra,* 486 F.2d at 207.

### The Indictment

■ Appellants contend the indictment was defective. They argue the pattern of racketeering failed to particularize the predicate acts in which each defendant was alleged to have been involved. This lack of specificity is claimed to have deprived appellants of notice of the charges against them and thereby to have thwarted effective trial preparation. This argument is without merit. An indictment need only track the language of the statute and, if necessary to apprise the defendant "of the nature of the accusation against him," *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962), state time and place in approximate terms. *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). The indictment in this case clearly met this requirement. So, for example, subparagraphs 13.B. and C. allege "[the following] acts [or] threats . . .: B. Arson with explosives of the home of Milan Vranes, in the vicinity of Pittsburgh, Pennsylvania, on and [sic] about January 4, 1977. C. Transportation of dynamite from Canada to the vicinity of Chicago, Illinois, in and [sic] around the spring, 1977." The remaining paragraphs are similarly sufficient. *See* Joint App. at A–56 to –59.

The claim that preparation for trial could not be undertaken without knowledge of which defendants were to be tied to the individual racketeering acts is more appropriately addressed to a bill of particulars, Fed.R.Crim.P. 7(f); *United States v. Murray,* 297 F.2d 812, 819 (2d Cir.), *cert. denied,* 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962), and in any event precisely this information was provided by the Government six

months before trial. A letter was sent listing each of the subparagraphs of paragraph 13 of the indictment and attributing each racketeering act to one or more defendants.

### The Jury Charge

■ Several elements of the jury charge are said to have been in error. First, appellants contend the jury was led to believe that conspiracy to commit the predicate acts constituted conspiracy to violate § 1962(c). We think Chief Judge Motley's instruction on conspiracy to violate RICO, which appears in large part to have followed the Supreme Court's recent elucidation of the statutory elements, *see generally United States v. Turkette, supra*, 452 U.S. at 578–83, 101 S.Ct. at 2526–28, was correct.

The court first charged that "a criminal enterprise as defined in the statute [must have] existed," and that "the defendant you have under consideration [must have been] associated with that enterprise." "Enterprise" was defined in detail. The jury was informed that the enterprise need not have a name, or be a commonly recognized legal entity, but could be a "group of individuals who are associated in fact although not a legal entity. Thus, any group of persons who associate together in order to achieve common illegal purposes can constitute a criminal enterprise under the statute." *Compare id.* at 583, 101 S.Ct. at 2528 ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.") And, the court stated that the jury "must find that a group of individuals in fact associated together for the purposes charged in the indictment—that is, to carry out a pattern of murders, arsons, extortions, and racketeering travel—and that the defendant you have under consideration was one such individual who associated himself with that criminal enterprise."

Turning to the conspiracy element here under attack, the judge stated that this necessitated the defendant "unlawfully, knowingly and willfully conspired with others to conduct the enterprise's affairs through a pattern of racketeering activity," language derived directly from 18 U.S.C. § 1962(d), and further distinguished from conspiracy merely to commit predicate acts of racketeering by the language which immediately followed: "that is, that the defendant conspired to commit at least two acts or threats . . . in aid of racketeering in the course of the activities of the enterprise." This instruction was well within the meaning of our cases. *See United States v. Scotto, supra*, 641 F.2d at 54 (one conducts activities of enterprise through pattern of racketeering when predicate offenses are simply related to activities of enterprise); *United States v. Weisman, supra*, 624 F.2d at 1122 (pattern of racketeering activity must be done "in the conduct of the affairs of an 'enterprise' ").[17]

■ Appellants also argue the court was obliged to charge the elements of the penal codes of the various states where acts of racketeering occurred, and was not permitted to rely upon generic definitions of murder, arson, and extortion. We disagree. Under RICO, as under the Travel Act, 18 U.S.C. § 1952; *see United States v. Nardello*, 393 U.S. 286, 289–95, 89 S.Ct. 534, 536–39, 21 L.Ed.2d 487 (1969), "[s]tate offenses are included by generic designation." H.R. Rep. No. 1549, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.Code Cong. & Ad. News 4007, 4032. "Courts construing the racketeering statutes have found that the references to state law serve a definitional purpose, to identify generally the kind of activity made illegal by the federal stat-

17. Similarly without merit is appellants' related argument. They note the Government charged, as part of the alleged conspiracy, but not in the substantive RICO allegations, acts agreed to in the course of the enterprise's activities but never completed. Based upon this difference, they claim the Government's theory under § 1962(d) was a conspiracy merely to perform the individual acts. But, in charging only completed racketeering acts in the substantive RICO count, the Government was simply following the dictum in *United States v. Weisman, supra*, 624 F.2d at 1123–24, that a § 1962(c) conviction must include proof of consummated acts of racketeering and not conspiracies or attempts, unless conspiracies or attempts to commit the substantive crimes included within § 1961(1)(D).

ute." *United States v. Salinas,* 564 F.2d 688, 690 (5th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800 (1978); *see United States v. Frumento,* 563 F.2d 1083, 1087 n. 8A (3d Cir.1977) ("Section 1961 requires, in our view, only that the *conduct* on which the federal charge is based be typical of the serious crime dealt with by the state statute, not that the .particular defendant be 'chargeable under State law,' at the time of the federal indictment.") (emphasis in original), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). Absent an allegation that the racketeering act is not prohibited *at all* under state law, *cf. United States v. Nardello, supra,* 393 U.S. at 295, 89 S.Ct. at 539, a claim obviously not available to appellants here, accurate generic definitions of the crimes charged were sufficient.

▮▮▮▮ Finally, the court's charges on "pattern of racketeering activity" and the "knowledge" element of conspiracy were detailed and correct. The language for the former came from the statute, and was similar to instructions we have upheld.

*E.g., United States v. Scotto, supra,* 641 F.2d at 53–54. As to "knowledge," the charge provided precisely the protection appellants now claim was lacking, since the district court first defined the objective of the "overall" conspiracy, *United States v. Tramunti,* 513 F.2d 1087, 1111–12 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), and then required the Government to demonstrate "an agreement as to the objective of the conspiracy. This does not mean that the conspirators must be shown to have agreed on the details of their criminal enterprise, but it does mean that the essential nature of the plan must be shown to have been agreed upon." And, "mere knowledge by a defendant of the conspiracy or any illegal act on the part of an alleged co-conspirator is not sufficient to establish his relationship in the conspiracy. You must find ... actual knowing participation of [the] defendant [under consideration] in the agreement ...." *See United States v. Gleason,* 616 F.2d 2, 16–17 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980).[18]

18. Remaining contentions applicable to more than one appellant merit only brief consideration. The assertion that the Government should not have extradited unindicted co-racketeer Miro Baresic to Sweden rings hollow in light of appellants' failure to show his availability would have assisted the defense. *United States v. Valenzuela-Bernal,* —— U.S. ——, 102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193 (1982). Moreover, Baresic's present whereabouts are known and secure (he is serving a life sentence in Sweden for the murder of the Yugoslavian ambassador to that country), yet appellants have never submitted an affidavit from Baresic setting forth his proposed exculpatory testimony, nor did they move in the district court to take his deposition, Fed.R.Crim.P. 15.

Concerning the claim that the proof at trial demonstrated multiple conspiracies, we have long held that the issue is a "question of fact for a properly instructed jury." *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980) (collecting cases). Long duration, change in membership, or "a shifting emphasis in its locale of operation," *United States v. Vila,* 599 F.2d 21, 24 (2d Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979), do not transform a single conspiracy into several. Here, the jury was correctly instructed, and the evidence amply supported its conclusion that the mailing of a series of identical extortion letters—followed by reprisals engineered by various of the appel-

lants; the common exchange of weaponry and explosives; the scientific evidence demonstrating most bombs were constructed in the same fashion; the numerous meetings and phone conversations among appellants, and their employment of various other persons to transport weapons and messages from one appellant to another, all taken together, established a common criminal enterprise in which each played a role.

Finally, demonstrably reliable "tool mark" identification testimony, which showed various bombs were constructed using the same implements, was properly admitted, *United States v. Williams,* 583 F.2d 1194, 1198 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); a chart summarizing telephone calls among the defendants was admissible and clearly caused no prejudice, since included among those named on the chart were several who were acquitted; the district court reasonably exercised its discretion in choosing to reread portions of the charge, rather than furnishing the jury with written copies of the charge for use during deliberations; and the plain language and different elements of § 1962(c) and § 1962(d), *see Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), combined with the absence of evidence of a contrary legislative intention, support the imposition of consecu-

We turn to an examination of the claims raised by individual appellants.

### Bagaric

 Bagaric advances two contentions. Initially, he challenges the sufficiency of the evidence. Viewing the evidence most favorably to the prosecution, and crediting every inference in its favor as we must at this stage of the case, *United States v. Singh,* 628 F.2d 758, 759, 765–66 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980), we conclude the evidence elicited from four accomplice witnesses (Caran, Skrabo, Vjelko Jaksic, and Mico Jaksic), *see United States v. Bermudez,* 526 F.2d 89, 99 (2d Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976), was more than sufficient to support the jury's verdict on both counts.

Bagaric's participation in the enterprise commenced as early as 1975. That year, he showed Caran weapons and explosives he and Ljubas were storing in Bagaric's basement. Caran testified Bagaric concealed the explosives in a mound of coal. Efforts were made on cross-examination to ridicule this testimony (by, for example, suggesting Bagaric did not heat his home with coal, Caran had not seen a shovel or furnace, and the pile of coal never became smaller), but a former manager of Bagaric's building testified that in 1977, when he assumed responsibility for the building, he too saw a pile of coal in the corner of the basement. This certainly served to strengthen Caran's credibility.

Further accomplice testimony showed Bagaric was the bomb-maker in two of the bombing incidents charged in the indictment as acts of racketeering. In 1976, Bagaric gave Skrabo and Vjelko Jaksic a time-bomb to carry to Pittsburgh to use at the home of Milan Vranes. In 1977, Bagaric travelled to San Francisco to wire bombs in Mile Boban's home. Later that year, Caran used one of the bombs in his unsuccessful attempt to bomb the Yugoslavian consulate in that city.

This evidence, standing alone, was sufficient to support the jury's guilty verdict. When combined with other testimony implicating Bagaric, along with Baresic and Mico Jaksic, in an aborted attempt on the life of Father Majic; tying him to the transportation of guns and ammunition from California to New York, via Chicago, and to the delivery of blasting caps to Caran; and otherwise demonstrating his allegiance to and knowledge of the operations of the enterprise, the evidence of Bagaric's guilt was more than ample.

 Bagaric's other claim is that the district court erred by admitting evidence of an act not alleged in the indictment as one of the predicate acts of racketeering. Specifically, he objects to the testimony of Mico Jaksic, that Jaksic met with Bagaric and Baresic in 1978, and the latter two men indicated they planned to bomb the church of Father Majic, only to be dissuaded by Jaksic. Bagaric contends this testimony was prejudicial, not significantly probative, and he was denied an opportunity to rebut it.

It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy. *United States v. Cohen,* 518 F.2d 727, 733 (2d Cir.), *cert. denied,* 423 U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975). Here, the testimony was properly admitted as proof of Bagaric's membership in the racketeering enterprise, and was clearly relevant to the alleged acts of racketeering. Father Majic was a critic of the extortion scheme and, in 1979, was a target of one of the book bombs, mailed to him at the same church Bagaric and Baresic told Jaksic they intended to bomb in the summer of 1978. *See United States v. Tramunti, supra,* 513 F.2d at 1118; *United States v. Persico,* 425 F.2d 1375, 1384 (2d Cir.), *cert. denied,* 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970).

tive sentences for violation of both subsections. *See Albernaz v. United States,* 450 U.S. 333, 336–42, 101 S.Ct. 1137, 1140–43, 67 L.Ed.2d 275 (1981); *United States v. Barton, supra,* 647 F.2d at 234–38 (cumulative sentences proper for RICO conspiracy and general conspiracy, 18 U.S.C. § 371).

Nor was Bagaric denied an opportunity to rebut this evidence. The proffered testimony of Father Svetozar Kraljevic, to the effect that Bagaric had always expressed love for Father Majic, was Bagaric's "own prior statement [offered] for the truth of the matter asserted, [and therefore] hearsay, and ... not admissible." *United States v. Marin,* 669 F.2d 73, 84 (2d Cir. 1982).

### Markich

■■■■■ As we have discussed, the proof showed that in May, 1977, Caran, Ljubas, and Mico Jaksic travelled to Elliott Lake, Ontario, Canada, and there obtained dynamite from Dennison Mines for later delivery to Markich in Skokie, Illinois. The Government was permitted to introduce documentary evidence showing Markich had lived in Elliott Lake in 1967 and was employed, at that time, by Dennison Mines. Markich objects to the introduction of this evidence on the ground it fell outside the scope of the conspiracy.

This claim is entirely without merit. There is no requirement that all the Government's evidence fall within the time period of the indictment, providing it is relevant to the charges. *See United States v. Del Purgatorio,* 411 F.2d 84, 86–87 (2d Cir.1969). Here, the evidence admitted was plainly relevant to show a relationship between Markich and the source of the dynamite in Elliott Lake, and to corroborate Caran's testimony that Markich received the dynamite after its importation from Canada.

### Primorac

■■■■ Appellant Primorac testified at trial. In the course of direct examination, he stated he had sought and been denied political asylum in the United States. On cross-examination, the prosecutor followed up on this issue, and Primorac admitted he had testified under oath at a deportation proceeding in 1979, at which time he had submitted the political asylum application. Over defense objection, the Government was permitted to inquire whether the Im-

migration Judge had "found [Primorac's] testimony and evidence ... not to be credible." (In fact, the Immigration Judge had stated that "his evidence regarding agents of Yugoslav Secret Police lurking around him for the last six years because of his pro-Croatian activities [was] not credible.") Primorac denied knowledge of the Immigration Judge's findings. He now contends this line of questioning was improper.

Pursuant to Fed.R.Evid. 608(b), the trial judge may permit cross-examination into specific acts of misconduct if "probative of truthfulness or untruthfulness." Although in this case the previous "misconduct" may have involved something less than a judicial finding of perjury, *see Walker v. Firestone Tire & Rubber Co.,* 412 F.2d 60, 63–64 (2d Cir.1969), it is clear that the prior misconduct need not have created criminal liability or resulted in a conviction, and in any event we have recently observed that "[p]roof that a judge ... before whom [the witness] had testified ... had found that [the witness] had 'guessed under oath' was probative of the weight to be accorded his testimony," *United States v. Terry,* 702 F.2d 299 at 316 (2d Cir.1983). Accordingly, we reject Primorac's claim.

### Logarusic

■■■■ Logarusic raises a number of claims, beginning with the argument that the evidence was insufficient to establish his participation in the conspiracy. This contention is refuted by the record. The single most damaging evidence introduced against Logarusic was the hollowed-out book found in the search of his Cleveland home on April 4, 1979. According to expert testimony for the Government, Logarusic's book, which had wires, a battery, and a light bulb inside, was the "prototype or perhaps test book" for the book bombs mailed to Joseph Badurina and Father Timothy Majic. As noted above, the similarities were more than striking. The cavities in all three were of identical size, just large enough to accommodate a stick of dynamite; the glue was the same chemical composition; the wires were the same gauge

and were arranged in the same fashion; and the wires were soldered to the battery rather than fastened with a standard battery connector. This tangible evidence was overwhelming proof of Logarusic's involvement in the crimes.

The Government also offered telephone toll records suggesting Logarusic had communicated with other appellants, and tool mark testimony showing the same pair of pliers had been used to cut a wire in Logarusic's book and to cut a wire in a time-bomb found in a search of the home of Franjo Ivic, one of the New York-based co-racketeers, convicted in the earlier trial before Judge Pollack. The jury also had before it Logarusic's explanation for the presence of the hollowed-out book in his home. Appellant claimed it had been left there by a man he had never before seen and has not seen since, and Logarusic did not regard as suspicious the cavity or wiring. The jury had a right to consider the credibility of this story, *United States v. Callabrass,* 607 F.2d 559, 565 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980), and we consider it hardly surprising it preferred, based on the evidentiary materials just summarized, the tale told by the Government.

 Appellant's next argument, obviously critical in light of the significance we have attributed to the items seized in the Cleveland search, is that the trial judge should have suppressed them. With regard to the affidavit submitted in support of the search warrant, which principally detailed facts providing a basis for believing Logarusic had bombed a pro-Yugoslav bookstore, Logarusic states first that it fell short of satisfying the standards of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), which together establish that the "supporting affidavits in an application for a search warrant must attest to the credibility of an informant and reliability of his information." *United States v. Burke,* 517

F.2d 377, 380 n. 2 (2d Cir.1975). Here, both criteria were met. The confidential police informant had provided information in the past that, on at least one occasion, had led to an arrest and indictment, *see United States v. Gazard Colon,* 419 F.2d 120, 122 (2d Cir.1969) (per curiam), and his reliability was further buttressed by independent corroborative accounts provided the police, and also included in the affidavit. The affidavit also satisfied the credibility prong of the test; it described as the basis for the informant's information his personal observations of Logarusic's activities at the scene of the bombing. *See United States v. Zucco,* 694 F.2d 44, 47 (2d Cir.1982).

 The affidavit is next challenged on the ground it failed to justify a finding of probable cause. Viewing the affidavit in a common sense fashion, *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), and paying substantial deference to the authorizing and reviewing judge, *United States v. Zucco, supra,* 694 F.2d at 46, 50, we believe the affidavit was sufficient to establish probable cause. It placed Logarusic at the scene of a pre-dawn bombing just before it took place; showed him inspecting the damage shortly after the explosion; demonstrated he had prepared, and placed in the window of the bookstore, a sign expressing contempt for the political and business affiliations of the store's owner with the present government of Yugoslavia; linked Logarusic to a Croatian nationalist group which had engaged in a series of similar terrorist acts against persons sympathetic to the Yugoslav regime; and noted Logarusic was a named suspect in two other bombings. Under the circumstances, we consider it entirely reasonable for the magistrate to have determined the explosives, used at 5:18 A.M., had been brought from Logarusic's home, and therefore that his residence was the likely location at which would be found the traces of bomb-making activity sought.[19] *See United States v. Haala,* 532 F.2d 1324, 1326–28 (10th Cir.1976).

**19.** Logarusic's challenge to the scope of the search is clearly without merit, as all the items

seized were in plain view. *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19

Appellant challenges several evidentiary rulings of the district court. Initially, he objects to the introduction of a pistol, registered to one Razov, who lived in the same two-family dwelling as Logarusic. The pistol had been discovered in Razov's car. Logarusic argues that the fact that the gun had been purchased by an official of the Paraguayan embassy at the time Baresic was employed there is insufficient to link Logarusic to Baresic. This claim is not insubstantial, as it points up the Government's dependence upon a chain of inferential reasoning perhaps too weak to support a determination of relevancy. *See United States v. Ravich,* 421 F.2d 1196, 1204–05 & n. 10 (2d Cir.), *cert. denied,* 400 U.S. 884, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). That is, Baresic did not buy the gun, but is tied to its purchase by virtue of his and the buyer's common employer; and Logarusic is not found to have been in possession of the gun, but is instead joined with its owner, Razov, by their common place of residence. These inferred relationships, together, are offered as proof of the association of Logarusic and Baresic. But, while the better course might have been to exclude the gun as prejudicial, *see* Fed.R.Evid. 403, we will not overturn the trial judge's decision to admit it absent a clear abuse of discretion, *see United States v. Robinson,* 560 F.2d 507, 512–16 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). In any event, any prejudice to Logarusic was minimal, in light of the virtual arsenal of weapons and ammunition seized from his home during the above described search, the relevancy of which is not challenged, and any error was therefore harmless beyond a reasonable doubt.

Logarusic challenges the admission of additional evidence linking him to Baresic. We refer to a letter discovered during a consent search of Logarusic's home on April 3, 1981, after his arrest. Appellant claims the letter was not properly authenticated. Fed.R.Evid. 901(a). We disagree. The requirement of authentication "is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims," *id.* This finding may be based entirely on circumstantial evidence, including "[a]ppearance, contents, substance . . . and other distinctive characteristics" of the writing, *id.* 901(b)(4). Here, the letter was addressed to Logarusic and postmarked Asuncion, Paraguay, where Baresic resided. It began with the salutation "Dear Vinko" and ended "your Miro Baresic . . . your Miro Toni." "Toni Saric" was the alias Baresic had used in gaining entry into the United States. The letter referred to "our people in Chicago," where four of the defendants lived, and it asked Logarusic to contact "Crni," which the proof showed was Ljubas's sobriquet among his confederates. It also contained references to "Mercedes," a friend of Logarusic who testified on his behalf and admitted knowing Baresic, and to "the Razov family," Logarusic's landlord. Finally, the letter stated that "[t]he Swedes, Americans, and Yugoslavs are requesting expulsion because I am a terrorist and dangerous," a fact confirmed by testimony that Baresic was a fugitive from Sweden where he was sought for the murder of the Yugoslavian ambassador. In sum, as Chief Judge Motley found, there was ample demonstration "that the letter was in fact what the Government claimed, i.e., a letter from Miro Baresic to Vinko Logarusic."

Logarusic's remaining contentions can be dealt with briefly. His acquittal on the substantive RICO count, even assuming it is in some sense "inconsistent"

---

L.Ed.2d 1067 (1968); *United States v. Ochs,* 595 F.2d 1247, 1256 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). Also without merit is the argument that the nighttime search of Logarusic's premises requires suppression. Even assuming there was no "reasonable cause" for the nighttime entry, *see* Fed.R.Crim.P. 41(c)(1), we will not exclude the seized items unless "(1) there was 'preju-

dice' in the sense that the search might not have occurred or would not have been so abrasive if [nonconstitutional rule 41] had been followed, or (2) there is evidence of intentional and deliberate disregard [of the rule]," *United States v. Burke, supra,* 517 F.2d at 386–87. Here, Logarusic has failed even to allege prejudice or misconduct.

with conviction on the conspiracy count, a proposition we dispute, does not require the latter be set aside. *E.g., Harris v. Rivera,* 454 U.S. 339, 345–46, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981); *United States v. Zane,* 495 F.2d 683, 690 (2d Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). Permitting cross-examination of Logarusic's wife concerning her possible antipathy toward the Government, based upon its prosecution of her brother for air piracy, was entirely proper. Mrs. Logarusic was a key witness in her husband's defense, and the potential for bias was self-evident. *See United States v. Harvey,* 547 F.2d 720, 722–23 (2d Cir.1976). And, the district court informed the jury of the limited nature of the inquiry. *See United States v. DeLillo,* 620 F.2d 939, 947 (2d Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). Finally, Logarusic had no right to production of Mrs. Logarusic's grand jury testimony. *See United States v. Percevault,* 490 F.2d 126, 128–31 & n. 4 (2d Cir.1974); *United States v. Ostrer,* 481 F.Supp. 407, 417 (S.D.N.Y.1978).

### Sudar

Of Sudar's claims, only four require discussion.

■ Appellant argues the evidence was insufficient to sustain his conviction on the Count One conspiracy charge, claiming the proof demonstrated only "that he contacted Caron [sic]" and was shown to be, at most, a " 'casual facilitator' whose conduct is ancillary to that of the principles [sic]." He ignores substantial record evidence.

For example, Sudar admitted to Caran that he had previously travelled to a motel in San Diego where he taught bomb-making to Croatians, including the brother of Marijan Rudela, who was proved to have been one of those responsible for the series of extortion-related bombings in the Los

Angeles area. Sudar also taught Caran the technique for bomb construction, making two trips to Connecticut in this connection. Independent evidence showed telephone calls which the jury was entitled to conclude were between Sudar and Logarusic, at the time of the mailing of book bombs to Badurina and Majic, to which Logarusic was connected. Moreover, in a search of Sudar's residence, Toronto police discovered various items, including wires, batteries, and a pipe end, which resembled various bomb paraphernalia linked to the enterprise at trial. An FBI expert witness specifically testified that a nine-volt battery discovered in Sudar's home was soldered in an unusual manner unique to the Croatian bombings proved at trial. This matrix of circumstantial evidence linking Sudar to the enterprise and its activities was sufficient to support the conspiracy conviction.[20]

■ Sudar challenges two aspects of the Government's use of evidence obtained during a Canadian investigation of his activities. First, he urges that the district court erred in admitting into evidence bomb-making paraphernalia that was found in the search of his residence on June 25, 1981, the day of his arrest. He contends this evidence was "other crimes evidence," inadmissible pursuant to Fed.R.Evid. 404(b). This contention is wide of the mark.

The seized items are simply not within Rule 404(b), since the possession of batteries, wires, watches and plastic bags, by itself, "[does] not ris[e] . . . to the level of a federal crime." *United States v. Bermudez, supra,* 526 F.2d at 95 n. 3. Rather, the search, conducted after the termination of the conspiracy, yielded evidence plainly relevant to prove its existence and appellant's participation. *See, e.g., id.* at 95 (lactose, a set of scales, and other items seized in post-indictment search); *United States v. Bennett,* 409 F.2d 888, 895–96 (2d Cir.) (same),

---

**20.** Appellant's related argument, that the evidence of his participation was slim enough to require an instruction on what he contends is the "lesser-included" 18 U.S.C. § 371 conspiracy, is misplaced. Section 371 is not a lesser-included offense of § 1962(d). *United States v. Barton, supra,* 647 F.2d at 236–37.

*cert. denied,* 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969).

■■■ Sudar also *complains of the intro-* duction of his admission, to Detective Rea of the Peel Regional Police Force, made during the search, that the items were his. Appellant claims the statements were taken in violation of *Miranda v. United States,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Be that as it may, the fact remains they were taken by a Canadian official, during his lawful pursuit of a separate and valid Canadian investigation into Sudar's activities, and there is no contention advanced that they were obtained either by duress or in violation of Canadian law. Therefore, the exclusionary rule does not apply. *United States v. Busic,* 592 F.2d 13, 23 (2d Cir.1978); *United States v. Nagelberg,* 434 F.2d 585, 587 n. 1 (2d Cir.1970) (dictum), *cert. denied,* 401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971). Sudar's reference to close cooperation between American and Canadian officials is insufficient to upset Chief Judge Motley's finding that Detective Rea conducted the search on his own country's authority and in connection with an ongoing Canadian investigation. We do not decide, therefore, the circumstances under which the relationship between American and foreign authorities might amount to a joint willful attempt to evade the strictures of *Miranda* or *Massiah, see United States v. Busic, supra,* 592 F.2d at 23 n. 7.

■■■ Appellant also urges his trial should have been severed from that of his co-defendants. We reject this claim. Virtually by definition, the pattern of racketeering alleged in this case constituted a "series of acts or transactions" sufficiently intertwined to permit a joint trial of all defendants, *see* Fed.R.Crim.P. 8(b). *United States v. Weisman, supra,* 624 F.2d at 1129. Nor has Sudar made out a showing of substantial prejudice, as he is required to do, to be deserving of a separate trial pursuant to Rule 14. *Id.* at 1129–30; *see United States v. DeSapio,* 435 F.2d 272, 280 (2d Cir.1970) (defendant must demonstrate more than greater level of involvement and culpability of co-defendants or "a better chance of acquittal"), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166.[21]

IV

The judgments of conviction are affirmed.

---

21. Along the same lines, Sudar claims he should have been granted a continuance, arguing he could have better prepared his cross-examination and further time would have assisted him in "undoubtedly numerous other ways." This vague allegation is insufficient, *see United States v. Lewis,* 565 F.2d 1248, 1252–53 (2d Cir.1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978), to persuade us the district court abused its discretion in denying the motion for a continuance.

Sudar's other claims may be considered summarily in this footnote. The refusal to charge the jury that it must find the existence of a racketeering enterprise known as the Croatian National Resistance (of which Sudar was not a member) was not error, since the prosecution quite clearly went forward on an enterprise-in-fact theory. Any reference in the first superseding indictment (under which Sudar was extradited, and which was consolidated with the second) to the formal organization was mere surplusage, *see United States v. Cirami,* 510 F.2d 69, 72–73 (2d Cir.), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1952, 44 L.Ed.2d 451 (1975).

Sudar's efforts to obtain Detective Rea's internal memoranda of communications among Canadian Police officers—which dealt not with Sudar's statements at the time of the search of his home, but instead concerned police procedures to be followed in carrying out the search—were properly rejected by Chief Judge Motley. *See United States v. Cotroni,* 527 F.2d 708, 712 (2d Cir.1975) (construing Fed.R. Crim.P. 16(a)(1)(A)), *cert. denied,* 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976).