UNITED STATES of America, Appellee,

v.

Joseph BIASUCCI, Jesse David Hyman, a/k/a "Doc," Stanley Gramovot, Alan Albenga, Melvin Cooper, Anthony Charles Capo, Jr., Oscar Louis Albenga, a/k/a "Al" and Chaim Gerlitz, Defendants-Appellants.

Nos. 459 to 464, 471 and 509, Dockets 85–1206 to 85–1212 and 85–1224.

United States Court of Appeals, Second Circuit.

Argued Nov. 25, 1985.

Decided March 17, 1986.

Gerald L. Shargel, New York City, for defendant-appellant Biasucci.

Michael Young, New York City (David Breitbart, New York City, of counsel), for defendant-appellant Hyman.

Susan G. Kellman, New York City, for defendant-appellant Gramovot.

Ralph Naden, New York City, for defendant-appellant Alan Albenga.

Thomas Puccio, New York City (Stroock & Stroock & Lavan, New York City, of counsel), for defendant-appellant Cooper.

Joel M. Stein, New York City, for defendant-appellant Capo.

Robert Blossner, New York City, for defendant-appellant Oscar Albenga.

Julia P. Heit, New York City, for defendant-appellant Gerlitz.

John F. Savarese, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Bruce A. Baird, Aaron R. Marcu, Warren Neil Eggleston, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before TIMBERS, PIERCE and MINER, Circuit Judges.

MINER, Circuit Judge:

Eight defendants appeal from judgments of conviction entered following a jury trial in the United States District Court for the Southern District of New York (Sand, J.) stemming from their involvement in a loan-sharking operation. Their principal contentions on this appeal are that certain videotapes recorded by a camera surreptitiously installed in a private business office should have been suppressed, that misconduct on the part of the prosecutor deprived them of a fair trial, that the trial court erroneously charged the jury on the state of mind the government must prove to establish the "collection of an unlawful debt," and that imposition of consecutive sentences for convictions under two statutes violated the double jeopardy clause of the Fifth Amendment. Finding that none of these or any of appellants' other arguments warrant reversal, we affirm the convictions in all respects.

## I. BACKGROUND

Appellants Joseph Biasucci, Jesse David Hyman, Melvin Cooper, Oscar Louis Albenga, Alan Albenga, Stanley Gramovot, Anthony Capo, Chaim Gerlitz, and seven others were indicted for a variety of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1982) ("RICO"), and extortion, 18 U.S.C. §§ 891–896 (1982), offenses.[1]

The charges against appellants stemmed from ten loans totaling approximately two-million dollars made by Resource Capital Group ("Resource Capital") in 1981 and 1982. Hyman and Cooper, who directed Resource Capital, were the central figures in these transactions. They conducted the scheme by drawing in customers with credit problems through promises of legitimate financing. They then would tell their customers that those funds were unavailable, but that the customers could get "emergency funds" at interest rates of one and one-half to five percent per week. As part of the effort to conceal the true nature of these transactions, the customers were obliged to sign documents falsifying the actual interest rates. Customers also were required to provide mortgages on their property, or shares in their businesses, as

---

1. Indictment S 84 Cr. 479, consisting of 23 counts, was filed on December 20, 1984. Count One charged all 15 defendants with conducting and participating in the affairs of an enterprise through a pattern of racketeering activity consisting of extortionate extensions of credit, financing extortionate extensions of credit, and extortionate collections of credit, as well as through the collection of unlawful debt, in violation of 18 U.S.C. § 1962(c). Counts Two through Five charged varying groups of the appealing defendants with acquiring interests in and control over four businesses through the collection of unlawful debt in violation of 18 U.S.C. § 1962(b). Count Six charged all eight appellants with conspiracy to violate 18 U.S.C. §§ 1962(b), (c), in violation of 18 U.S.C. § 1962(d). Counts Seven through Twenty-Three charged various groups of defendants with a number of extortionate extensions of credit, financing extortionate extensions of credit, and extortionate collections of credit, in violation of 18 U.S.C. §§ 892–894, all of which were predicate offenses in the pattern of racketeering activity charged in Count One.

security for the loans. Interest payments were due weekly, and when the borrowers had difficulty meeting the payments, they were threatened with loss of their property, loss of control of their businesses, or physical injury.

The other appellants were involved with the loansharking operation in various ways. Biasucci and Gerlitz made funds available to Hyman and Cooper to operate the loansharking business and shared in the illicit profits collected from the business's customers. Gramovot brought one of the enterprise's victims to Resource Capital and later shared in the effort to take control of her business. Oscar Albenga was the chief collector of money from victims and Alan Albenga worked under his direction. Capo physically assaulted one of the enterprise's victims and, together with several other defendants, attempted to force that victim to sign over his interest in his business to the defendants.

At trial, the government established the existence of this racketeering enterprise and its loansharking activities principally through the testimony of victims of the loansharks, over 100 tape-recorded conversations from the Resource Capital offices and other locations, several videotapes recorded by a camera that had been surreptitiously installed in the Resource Capital offices, and various records and documents seized from the Resource Capital offices. After a thirteen-week trial and five days of deliberation, the jury returned guilty verdicts against the eight appealing defendants on various counts of the indictment and acquitted seven other defendants on all counts.[2]

This appeal presents essentially four issues. First, appellants argue that the visual electronic surveillance of the Resource Capital offices, conducted pursuant to a court order, was improper because no statutory authority provided for such surveillance, and that even if authority did exist, the government failed to demonstrate a valid basis for such surveillance. Second, they contend that the RICO statute, 18 U.S.C. §§ 1962(b) and (c), required that the government establish that each defendant had specific knowledge of the actual rate of interest charged on a usurious loan and that Judge Sand's failure to so instruct the jury was error. Third, appellants argue that they were deprived of a fair trial by certain acts of prosecutorial misconduct. Finally, Hyman and Cooper claim that the same conduct formed the basis for their convictions under both section 1962(b) and section 1962(c) and that consecutive sentences on these convictions, therefore, violated the double jeopardy clause of the Fifth Amendment. Finding these arguments, as well as all others presented by appellants, to be without merit, we affirm the convictions.

## II. DISCUSSION

### A. *Visual Electronic Surveillance*

On November 30, 1982, District Judge Thomas C. Platt issued an order pursuant to Fed.R.Crim. P. 41 and 57(b) authorizing Federal Bureau of Investigation ("FBI") agents to enter the Resource Capital offices and install a hidden video camera, which would record the movements of all persons who entered the premises over a

---

**2.** All appealing defendants, except Capo, were convicted of violating 18 U.S.C. § 1962(c) (Count One). Hyman and Cooper were convicted of violating 18 U.S.C. § 1962(b) by acquiring interests in four businesses (Counts Two through Five). Gerlitz was convicted of violating § 1962(b) by acquiring interests in three businesses (Counts Two through Four). In addition, Biasucci was convicted on Count Two; Oscar and Alan Albenga were convicted on Count Three; and Gramovot was convicted on Count Four. All eight appellants were convict-

ed of violating 18 U.S.C. § 1962(d) by conspiring to participate in the affairs of a racketeering enterprise (Count Six). Oscar Albenga was convicted of an extortionate collection of credit (Count Eight); Hyman and Cooper were convicted of an extortionate collection of credit (Count Sixteen); and Alan Albenga was convicted of an extortionate collection of credit (Count Twenty-Two). Counts Seven and Twenty were dismissed at the end of the government's case. All defendants were acquitted on the remaining counts submitted to the jury.

thirty-day period.[3] Prior to trial, the defendants unsuccessfully moved to suppress the fruits of this surveillance, and the government thereafter offered into evidence ten of the videotapes. Appellants Hyman, Cooper, and Gerlitz argue that this surveillance was improper because no statutory authority provided for video surveillance in domestic criminal investigations, and even if authority did exist, the government failed to demonstrate a valid basis for such surveillance.

■ Appellants correctly note that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1982), which authorizes federal judges to issue warrants (orders) for domestic wiretapping and electronic eavesdropping, does not authorize federal courts to permit visual electronic surveillance of private premises. *United States v. Torres,* 751 F.2d 875, 880 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985); *United States v. Ianniello,* 621 F.Supp. 1455, 1467 (S.D.N.Y. 1985); *In re Order Authorizing Interception of Oral Communications and Videotape Surveillance,* 513 F.Supp. 421, 422–23 (D.Mass.1980); *People v. Teicher,* 52 N.Y.2d 638, 652–53, 439 N.Y.S.2d 846, 853, 422 N.E.2d 506, 513 (1981); *Sponick v. City of Detroit Police Department,* 49 Mich.App. 162, 198, 211 N.W.2d 674, 690

(1973). The statute sanctions only the "interception of wire or oral communications." 18 U.S.C. §§ 2516(1), 2518(1) (1982); *cf. United States v. New York Telephone Co.,* 434 U.S. 159, 166, 98 S.Ct. 364, 369, 54 L.Ed.2d 376 (1977) (pen registers are not governed by Title III because they are not concerned with "the *aural* acquisition of the *contents* of any wire or oral *communication*" (emphasis in original)).

Nor does the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801–1811 (1982) ("FISA"), which is broad enough to embrace visual electronic surveillance, *id.* § 1801(f), authorize such surveillance in domestic criminal investigations. The FISA allows the government to use electronic surveillance only for the purpose of obtaining "foreign intelligence information." *Id.* § 1804(a)(7)(B); *see United States v. Duggan,* 743 F.2d 59, 77–78 (2d Cir.1984) (FISA warrant properly limited to foreign intelligence purposes); S.Rep. No. 604, 95th Cong., 2d Sess. 5, 7–10 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad. News 3904, 3906, 3908–11.

■ On the other hand, nothing in Title III or the FISA indicates that Congress intended to prohibit video surveillance in domestic criminal investigations.[4] Thus, all that can be said is that Congress has not yet enacted any legislation explicitly authorizing domestic electronic video surveil-

---

**3.** The order was extended on January 12, 1983 for an additional 30-day period. The government also installed a microphone in the Resource Capital offices to record sound. None of the appellants contests the validity of that aural surveillance.

**4.** Appellants argue that there is such an indication in the FISA and its legislative history. As part of that Act, Congress amended Title III, stating "the procedures in this chapter and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire and oral communications may be conducted." 18 U.S.C. § 2511(2)(f); *see also* S.Rep. No. 604, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S. Code Cong. & Ad.News 3916–17 ("S. 1566 would alter the current debate arising out of the uncertainty of the present law by completing an exclusive charter for the conduct of electronic

surveillance in the United States."). Citing this amendment, appellants contend that Title III and the FISA are the exclusive sources of authority for electronic surveillance. This same argument was presented to the Seventh Circuit, which responded: "All this section means ... is that the [FISA] is intended to be exclusive in its domain and Title III in its." *Torres,* 751 F.2d at 881. Furthermore, the Senate Report that accompanied the bill which eventually was enacted as the FISA referred to § 2511(2)(f) as strictly a technical and conforming amendment. S.Rep. No. 604, 95th Cong., 2d Sess. 3, 63–64, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3904, 3904, 3964–65. If § 2511(2)(f) was intended to restrict any power of government, its focus was on the President's implicit power to use television surveillance for the protection of national security. We agree with the Seventh Circuit that this amendment should not be read as a prohibition of video surveillance in domestic criminal investigations.

lance. Prior to the 1968 enactment of Title III, there similarly was no specific statutory authorization for wiretapping or electronic eavesdropping. Nevertheless, the Supreme Court had approved the court-ordered use of a concealed electronic device to record conversations, holding that the government had satisfied Fourth Amendment requirements. *Osborn v. United States*, 385 U.S. 323, 328–31, 87 S.Ct. 429, 432–34, 17 L.Ed.2d 394 (1966); *cf. Katz v. United States*, 389 U.S. 347, 354–59, 88 S.Ct. 507, 512–16, 19 L.Ed.2d 576 (1967) (wiretapping of telephone booth held unconstitutional because FBI agents did not obtain prior judicial approval); *Berger v. New York*, 388 U.S. 41, 58–59, 87 S.Ct. 1873, 1883–84, 18 L.Ed.2d 1040 (1967) (New York wiretapping statute held unconstitutional because it did not adequately incorporate constitutional standards); *Silverman v. United States*, 365 U.S. 505, 513, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961) (Douglas, J., concurring) (noting that because agents had failed to secure a search warrant as "required by the Fourth Amendment and Rule 41 of the Federal Rules of Criminal Procedure," the electronic surveillance was illegal).

In more recent times, the Supreme Court has held that Fed.R.Crim. P. 41 [5] authorizes the issuance of a warrant permitting the use of a pen register. *New York Telephone*, 434 U.S. at 168–70, 98 S.Ct. at 370–71 (citing *Katz* and *Osborn* ). The Court further has noted that Fed.R.Crim. P. 57(b) [6] reinforces its "conclusion that Rule 41 is sufficiently broad to include seizures of intangible items...." 434 U.S. at 170, 98 S.Ct. at 371.[7]

■ Relying primarily on *New York Telephone*, the Seventh Circuit has held that a district court, pursuant to Rule 41, may issue an order authorizing television surveillance of the interior of an apartment allegedly being used by a terrorist organization as a "safe house" to assemble bombs. *Torres*, 751 F.2d at 883; *accord Ianniello*, 621 F.Supp. at 1467; *cf. United States v. Aiello*, 771 F.2d 621, 631–32 (2d Cir.1985) (videotapes received into evidence where no objection on constitutional grounds was raised). Finding the reasoning in *Torres* to be compelling, we join the Seventh Circuit and hold that district courts, federal magistrates, and state judges may authorize television surveillance of private premises in appropriate circumstances. The only questions remaining then are: (1) In what circumstances and by what standards should visual electronic surveillance be permitted?; and (2)

**5.** Rule 41 provides in pertinent part:

Property or persons which may be seized with a warrant. A warrant may be issued under this rule to search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense; or (4) person for whose arrest there is probable cause, or who is unlawfully restrained.

"Rule 41 is not limited to tangible items but is sufficiently flexible to include within its scope electronic intrusions authorized upon a finding of probable cause." 434 U.S. at 169, 98 S.Ct. at 371.

**6.** Rule 57(b) provides in pertinent part that "[i]f no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute." Thus, irrespective of Rule 41, federal district courts have an inherent power to issue warrants authorizing domestic video surveillance. *Torres*, 751 F.2d at 878–79.

**7.** Gerlitz argues that the Supreme Court's discussion in *New York Telephone* concerning the scope of Rule 41 is mere orbiter dicta because the Court subsequently held that individuals have no legitimate expectation of privacy in the information seized by pen registers. *See Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). In our view, *New York Telephone* still retains precedential value in regard to the scope of Rules 41 and 57. *Smith* only decided that, since a pen register invaded no privacy interests of the defendant, a search warrant was not required. *Smith* did not consider the scope of Rules 41 and 57. Moreover, at the time *New York Telephone* was decided, the Supreme Court clearly assumed for the purpose of that case that the Fourth Amendment did apply to pen registers and that a Rule 41 warrant was necessary. Finally, *New York Telephone* is sound in its reasoning and drew upon abundant historical and judicial support for its conclusion.

Does this case present such circumstances? The answers to these questions involve the traditional balancing of the interests of personal privacy and the interests of law enforcement, which is the function of fourth amendment jurisprudence.

■ In *Berger* and *Katz,* both of which antedated the passage of Title III, the Supreme Court set forth the minimum constitutional standards governing the use of aural electronic surveillance. First, a warrant authorizing such surveillance may issue only upon probable cause, supported by oath or affirmation, that a particular person is committing, has committed, or is about to commit a crime. Second, the Constitution requires particularization in the warrant, i.e., the warrant must describe the place to be searched; the person or thing to be seized; the crime that has been, is being, or is about to be committed; and the information sought. Third, concern with the indiscriminate nature of electronic surveillance led the *Berger* Court to require that a warrant authorizing electronic surveillance be sufficiently precise so as to minimize the recording of activities not related to the crimes under investigation. Finally, before a court may issue a warrant authorizing electronic surveillance, it must certify that there is no less intrusive means for obtaining the needed evidence. Given the obvious similarities between aural and video electronic surveillance, we believe that the same constitutional standards governing the former should be applied in determining whether or not to authorize the latter.

In addition, when Congress passed Title III, it obviously considered the competing policies of protecting personal privacy and ensuring effective law enforcement, and there is abundant evidence that it specifically intended to adopt the constitutional guidelines announced in *Berger* and *Katz.* S.Rep. No. 1097, 90th Cong. 2d Sess. 66 (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2153–63. Thus, we deem it wise, if not necessary, to look to the more precise standards Congress adopted in Title III for audio surveillance in promul-

gating guidelines for court-ordered authorization of video surveillance. *See Order Authorizing Interception,* 513 F.Supp. at 422–23.

In similar fashion, the *Torres* court borrowed four provisions of Title III implementing the Fourth Amendment's requirements of particularity and minimization as a "measure of the government's constitutional obligation of particular description in using television surveillance to investigate crime." 751 F.2d at 885. These four provisions are: (1) the judge issuing the warrant must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c); (2) the warrant must contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates," *id.* § 2518(4)(c); (3) the warrant must not allow the period of interception to be "longer than is necessary to achieve the objective of the authorization, [ ]or in any event longer than thirty days" (though extensions are possible), *id.* § 2518(5); and (4) the warrant must require that the interception "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under [Title III]," *id.*

We likewise believe that these standards, borrowed from Title III, together with the more general constitutional requirements, form a sufficient outline of the showing the government must make before a warrant should issue authorizing video surveillance. Applications for video surveillance should not be strictly judged by all of the other procedures and requisites of Title III, however, because, like the Seventh Circuit, we borrow the statutory standards quoted above as a measure of the government's constitutional obligation.

■ A review of the government's application for the November 30, 1982 warrant demonstrates that all of the constitutional requirements set out above were met. The application contained the following: (1) written authorization from the Department

of Justice; (2) a particular description of the location, people, and offenses to be surveilled; (3) a statement regarding the necessity for such surveillance; (4) minimization procedures so that only authorized activity would be surveilled; and (5) provision for periodic reports on the progress of the surveillance. In addition, the affidavits submitted by an Assistant United States Attorney and an FBI Special Agent sufficiently detailed the basis for probable cause to believe that criminal activities were being conducted in the Resource Capital offices and explaining why other means of investigation were inadequate. Finally, the warrant was issued for only thirty days (although later extended for an additional thirty days) and contained all the requisite findings and protections.

■ Appellants, citing our decision in *United States v. Lilla,* 699 F.2d 99 (2d Cir.1983), contend that the government failed in this case to demonstrate that video surveillance was necessary.[8] In *Lilla,* we held that the government had failed to establish that other investigative procedures were either unlikely to succeed or too dangerous to use. The Title III affidavit in *Lilla* did not reveal what, if any, investigative techniques were attempted prior to the wiretap request. Instead, it merely asserted that "no other investigative method exists to determine the identity" of individuals who might have been involved in the narcotics transaction. Accordingly, we concluded that the government had failed to meet the requirements of Title III.

■ Here, in contrast, the affidavit of FBI Special Agent Nye, which was submitted in support of the request for video surveillance, specified that: (1) some confidential sources who had reported on the activities of the subjects of the investigation had refused to testify; (2) the under-

cover agent had not been permitted to be present during the passing of money and checks between one of the victims and Hyman; (3) the agent had not been allowed to be present at all meetings at Resource Capital; (4) interviews with victims at the time were not feasible because of the risk that such interviews would alert the individuals associated with Resource Capital to the investigation; (5) search warrants and further investigative grand juries would be considered in the future but were not expected to produce significant evidence at the time; and (6) prior victims would be unlikely to testify for fear of reprisals by individuals associated with Resource Capital, and interviews with those prior victims would alert individuals associated with Resource Capital to the investigation.

We previously have stated that a reviewing court must consider affidavits submitted in support of wiretap applications in a " 'common sense and realistic fashion' " and with "the deference properly accorded to the issuing judge." *United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir.) (quoting *United States v. Ivic,* 700 F.2d 51, 57 (2d Cir.1983), and citing *United States v. Perry,* 643 F.2d 38, 50 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981)), *cert. denied,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). The undeniable reality here is that threats, fear, and violence were the mainstays of Resource Capital's daily operating procedures. Like much of organized crime, it operated behind an enforced wall of secrecy. Recognizing the nature of such organizations, Congress and the courts both have accepted that extraordinary investigative techniques are needed to successfully wage the battle against organized crime. *See, e.g.,* S.Rep. No. 1097, 90th Cong.2d Sess. 70, *reprinted in,* 1968 U.S. Code

---

**8.** Gerlitz also claims that the order was insufficiently particular because it did not identify "the precise location within the offices of Resource Capital" where the camera would be placed. The order specified that the camera would be placed "within the premises known as Resource Capital Group, Limited, Suite Number W–85, 2001 Marcus Avenue, Lake Success, New York...." This warrant, which specified the suite number, sufficiently particularized the premises to be surveilled. Further particularization would have served no useful purpose, especially since the camera was placed in business premises, where expectations of privacy are much lower than in a private residence.

Cong. & Ad. News 2112, 2157 ("major purpose of title III is to combat organized crime"). Here, Agent Nye's affidavit enumerated adequate facts to support his conclusion that video surveillance was necessary. On this record, we conclude that Judge Platt's warrant authorizing video surveillance of the Resource Capital offices met all the constitutional standards set out above.

## B. Mens Rea *Element of RICO*

In his instructions to the jury, Judge Sand explained that the defendants could be found guilty of participating in, or aiding or abetting, the collection of an unlawful debt only if the jury found that they had acted "knowingly, wilfully, and unlawfully." Judge Sand further explained that the government could meet this burden *either* by proving specific knowledge of the interest rates on the usurious loans, *or* by showing the defendants' awareness "of the generally unlawful nature of the particular loan in question and also that it was the practice of the lenders to make such loans."

■ Biasucci, Gerlitz, and Capo, who were convicted for aiding and abetting the collection of an unlawful debt, contend that these instructions were erroneous. In particular, they claim that the government was required to establish that they had knowledge of the specific rates of interest being charged on the usurious loans. We do not agree that RICO requires proof of such specific knowledge, and we therefore find no error in Judge Sand's instructions.

We previously have observed that RICO imposes no additional *mens rea* requirement beyond that found in the predicate crimes. *United States v. Scotto,* 641 F.2d 47, 55 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *United States v. Boylan,* 620 F.2d 359, 361–62 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). Consequently, we look to the *scienter* elements found in the statutory definitions of the predicate crimes to determine the degree of

knowledge that must be proved to establish a RICO violation.

Section 1961(6) defines an "unlawful debt" as "a debt (A) ... which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of ... lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." No federal usury law applies in this case; instead, since the usurious loans charged in the indictment took place in New York, we look to New York usury law, which provides: "A person is guilty of criminal usury ... when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan ... at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." N.Y.Penal Law § 190.40 (McKinney Supp.1986). Section 190.40 does not require a specific intent to violate the usury laws. *Hammond v. Marrano,* 88 A.D.2d 758, 759, 451 N.Y.S.2d 484, 485 (4th Dep't 1982).

Likewise, the policies underlying RICO and the New York usury laws impel us not to require knowledge of the specific interest rates charged on usurious loans. RICO was enacted to "seek the eradication of organized crime in the United States by strengthening the legal tools ... to deal with the unlawful activities of those engaged in crime." Statement of Findings, Organized Crime Control Act of 1970, 84 Stat. 923. The elimination of loansharking was one of Congress' principal aims in enacting the statute. S.Rep. No. 617, 90th Cong., 2d Sess. 78–80; H.R.Rep. No. 1574, 90th Cong., 2d Sess. 5. Given those goals, Congress could not have intended to hobble the government's ability to combat loansharking by requiring it to prove knowledge of the specific interest rates charged. As we previously have recognized, Congress expressly commanded that the RICO statute "be liberally construed to effectuate its remedial purposes." *Ruggiero,* 726

F.2d at 919 (quoting Pub.L. No. 91–452, § 904(a), 84 Stat. 947 (codified at 18 U.S.C. § 1961, note)). Similarly, the New York State Legislature, in adopting section 190.-40, sought "to tighten the laws against 'loansharking' and to provide law enforcement with an effective weapon against 'organized or systematic loansharking.'" *People v. Ayers,* 109 Misc.2d 870, 872, 440 N.Y.S.2d 1019, 1021 (Nassau County Ct. 1981) (quoting Governor's Memorandum, McKinney's 1965 Session Laws of New York, p. 2101).

In sum, nothing in the language of section 1961(6), which defines the elements of unlawful debt collection, the applicable New York usury laws, or the policies underlying RICO suggests the government must prove that a defendant had knowledge of the specific rates being charged on usurious loans. By its terms, all that RICO requires is proof that a debt existed, that it was unenforceable under New York's usury laws, that it was incurred in connection with the business of lending money at more than twice the legal rate, that the defendant aided collection of the debt in some manner, and that the defendant acted knowingly, willfully and unlawfully.

As a general rule, aiders and abettors are punishable as principals. 18 U.S.C. § 2(a) (1982). We recently held that specific knowledge of a fact need not be proven to convict an aider or abettor, absent such direction in the statute itself. *United States v. Falu,* 776 F.2d 46, 49 (2d Cir. 1985); *see, e.g., United States v. Yermian,* 468 U.S. 63, 104 S.Ct. 2936, 2943, 82 L.Ed.2d 53 (1984) (knowledge of federal agency jurisdiction not required by 18 U.S.C. § 1001); *United States v. Feola,* 420 U.S. 671, 684, 95 S.Ct. 1255, 1263, 43 L.Ed.2d 541 (1975) (knowledge that victim is a federal officer not required by 18 U.S.C. § 111); *United States v. Ardito,* 782 F.2d 358, 362 (2d Cir.1986) (knowledge that obstructed proceeding is federal in nature not required by 18 U.S.C. § 1503); *United States v. Roglieri,* 700 F.2d 883, 885 (2d Cir.1983) (knowledge that item has been stolen from mail not required by 18 U.S.C.

§ 1708). Appellants have not pointed to any evidence in RICO or its legislative history indicating that specific knowledge of the interest rates charged is required. Accordingly, we see no reason to require proof of such knowledge.

## C. *Prosecutorial Misconduct*

■ Appellants contend that certain prosecutorial misconduct deprived them of a fair trial. In particular, they argue that the use of the metaphor "iceberg" to describe the criminal enterprise intimated that the evidence adduced at trial was only the "tip" of the "iceberg" of other unproven criminal activity. Appellants also argue that the cumulative effect of various other remarks made by the prosecutor during the course of the trial was unduly prejudicial. Both contentions are without merit.

The use of the term "iceberg" was not improper. The government is not barred from using rhetorical devices during the trial. *United States v. Bagaric,* 706 F.2d 42, 60 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983). Here, the "iceberg" metaphor was used for the limited purpose of describing the structure of the loansharking operation: the "tip" of the "iceberg" being the business front, and the submerged segment, concealed from view, representing the rest of the enterprise. The use of the metaphor was not, as appellants contend, a reference to evidence of other crimes not adduced at trial. This use of the "iceberg" metaphor was entirely proper. *Cf. Hutchins v. Wainwright,* 715 F.2d 512, 515–16 (11th Cir.1983) (government may not use iceberg metaphor to argue to the jury that the crimes proved at trial are only one part of defendant's illegal activities), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984); *Stimack v. Texas,* 548 F.2d 588, 588–89 (5th Cir. 1977) (per curiam) (same); *United States v. Grossman,* 400 F.2d 951, 955–56 (4th Cir.) (same), *cert. denied,* 393 U.S. 982, 89 S.Ct. 453, 21 L.Ed.2d 443 (1968).

The other remarks of the prosecutor objected to by appellants stand on different

footing, because they clearly were inappropriate. First, in his rebuttal statement, the prosecutor improperly suggested to the jury that the government could have prolonged the trial for three months. Second, the prosecutor repeatedly engaged in needless and unwarranted *ad hominem* attacks against defense counsel.[9]

The fundamental question in such circumstances is whether the prosecutor's misconduct caused substantial prejudice to the defendants, thereby depriving them of their rights to a fair trial. *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir. 1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *United States v. Praetorius,* 622 F.2d 1054, 1060 (2d Cir.1979), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). At the same time, criminal convictions are not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone in an otherwise fair proceeding. *United States v. Young,* — U.S. —, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) (context in which remarks were made must be examined to determine the probable effect on the jury's ability to judge the evidence fairly); *United States v. Wilkinson,* 754 F.2d 1427, 1435 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). Accordingly, we have adopted a contextual approach that considers the following factors: "the severity of the mis-conduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Modica,* 663 F.2d at 1181.

■ Applying these factors, we find that the prosecutor's comment about being able to prolong the trial for three months, although improper, does not mandate the extraordinary remedy of reversal. Significantly, Judge Sand had it stricken from the record and gave an immediate curative instruction.[10] In any event, as set out more fully below, we are convinced that appellants would have been convicted even absent this improper statement.

■ Similarly, although the prosecutor's disparaging remarks about defense counsel certainly were improper and have no place in any court, they were inconsequential, isolated aberrations in a lengthy trial. These remarks do not appear to have been made in bad faith. Indeed, the prosecutor conceded their impropriety when chastised by the district court. They were instead imprudent and infrequent "outbursts." In this light, we cannot say that the trial rose to the level of a proceeding marked by passion and prejudice. *Cf. Bagaric,* 706 F.2d at 58–59; *Modica,* 663 F.2d at 1181. More important, Judge Sand gave appropriate curative instructions, thereby mitigating any possible prejudice.[11]

9. For instance, the prosecutor addressed defense counsel at one point as "you sleaze," tr. at 6512, at another as "you hypocritical son——," tr. at 2730, as being "so unlearned in the law," tr. at 3152, and on several occasions the prosecutor objected to questions by the defense as "nonsense," tr. at 90, 2220, 4527, 4528.

10. Immediately after the prosecutor made this remark, Judge Sand interjected: "Ladies and gentlemen, you are to decide this case on the evidence which has been presented and the reasonable inferences that can be drawn from the evidence that has been presented. That is the basis upon which you are to decide this case. That is the only basis upon which you are to decide this case." Tr. at 9540.

   After defense counsel questioned whether this instruction was sufficient, Judge Sand further instructed the jury to understand the government's comment only as its "contention that it sustained its burden of proof," and "not to construe the government's remarks ... as any sug-gestion that there were witnesses or evidence available to the government as to matters not already before you."

   The final instructions to the jury also reflected this correction:

   In its rebuttal summation, the government asserted that it could have prolonged the trial for three months. This remark is stricken. You are not to construe the government's remark, however, even though it is stricken, as any suggestion that there are witnesses or evidence available to the government as to matters not already before you.

   Tr. at 9632–33.

11. Judge Sand on several occasions admonished the prosecutor for the use of "nonsense" in his objections. Tr. at 90, 2220, 4528. The remark concerning defense counsel being unlearned in the law was stricken from the record. Tr. at 3152. After one particularly inflammatory remark, Judge Sand instructed the jury as follows:

Finally, absent the prosecutor's improper remarks, the eight appellants certainly would have been convicted. There was ample evidence of their wrongdoing, including the testimony of several victims of the loansharks and the tape recordings of conversations at the Resource Capital offices. Seven of the fifteen defendants were acquitted of all charges and the eight appellants were convicted of only some of the charges against them. *See supra* notes 1–2. This demonstrates the meticulous care the jury exercised in weighing the evidence and reaching its verdict and therefore reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence fairly and free from passion and prejudice.[12]

In sum, although the prosecutor's statements clearly were improper in several instances, they did not result in substantial prejudice to the appellants so as to deprive them of a fair trial.

### D. *Double Jeopardy*

■ Hyman and Cooper each were convicted on Count One of the Indictment for violation of 18 U.S.C. § 1962(c) and on Counts Two through Five for violation of 18 U.S.C. § 1962(b). Each was sentenced to twenty years' imprisonment on Count One and to a total of ten years' imprisonment on Counts Two through Five, consecutive to the sentence imposed on Count One. Hyman and Cooper argue that, because these convictions arise from the same acts or transactions, the cumulative punishment imposed by the district court violates the double jeopardy clause. We disagree.

It has long been settled that "a single transaction may give rise to liability for distinct offenses under separate statutes without violating the Double Jeopardy Clause." *United States v. Barton*, 647 F.2d 224, 235 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). As the Supreme Court has directed:

> The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):
>
> "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to deter-

Ladies and gentlemen of the jury, I am told that just prior to the recess a remark was made by the Government attorney which I did not hear and which you may have heard, which is unfortunate. I ask if you did hear it that you disregard it because it was improper.

Let me say something which you are already experts at, and that is the recognition of the fact that in a case of this length and of this nature emotions sometimes run high. Sometimes attorneys are carried away by the zeal of the representation of the interests of their client, be it the Government or the defendants. Sometimes they say things which in calm hindsight and reflection they may know were improper. That's because they are human beings and we have no substitute for human beings.

It is important, however, for you, as jurors, to keep your eye on the ball, and the ball is what are the facts? Who is telling the truth? [A]nd other matters which I will explain in some detail in my charge....

   \*    \*    \*    \*    \*    \*

So I ask you to put out of your minds entirely the incident which just occurred prior to the recess. If you happened to hear it or any other exchanges that have taken place during the course of the trial in which I have had occasion to admonish counsel or indicate to counsel the manner in which they were proceeding was improper.

12. In reaching this conclusion, we do not condone or approve the prosecutor's unprofessional comments. Nevertheless, as we have stated before, "[r]eversal is an ill-suited remedy for prosecutorial misconduct ... [where] an individual ... was fairly convicted." *Modica*, 663 F.2d at 1184. In the instant case, we do not believe the prosecutor's comments, in context, even border on requiring reversal. Sanctions for such misconduct preferably are left to the trial judge, since he "is in an especially well-suited position" to assess the severity of the misconduct and the need for and level of a response. Here, Judge Sand seemed fully aware of the range of remedies available to him, and he did a commendable job of controlling the overall tenor of the trial. Accordingly, we see no reason to address the prosecutor's misconduct further in this opinion.

mine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not...."

*Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); *United States v. Langella,* 776 F.2d 1078, 1081–82 (2d Cir.1985).

In applying the *Blockburger* test, we are required to focus on the statutory elements of each offense. *Langella,* 776 F.2d at 1082 (citing *Albernaz v. United States,* 450 U.S. 333, 338, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981)). If each *statute* requires proof of a fact that the other does not, the *Blockburger* test is satisfied, even if the same proof is used at trial to establish both crimes. *Id.*

In the instant case, sections 1962(c) and 1962(b) are sufficiently distinguishable to permit the imposition of cumulative punishment. Section 1962(c) requires the government to prove that a defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Significantly, section 1962(c) does not require proof that a defendant acquired or maintained any interest in a victim's business. By contrast, section 1962(b) requires the government to demonstrate that a defendant "through a pattern of racketeering activity or through collection of an unlawful debt ... acquire[d] or maintain[ed], directly or indirectly, any interest in or control of any enterprise." The distinction is clear—section 1962(b) proscribes the acquisition or maintenance of a victim's enterprise, while 1962(c) prohibits the conduct of the criminal enterprise.[13]

The statutory offenses involved here each require proof of an element that the other does not, and, therefore, support the imposition of consecutive sentences for these violations. *Cf. Bagaric,* 706 F.2d at 63–64 n. 18 ("the plain language and different elements of § 1962(c) and § 1962(d) ..., combined with the absence of evidence of a contrary legislative intention, support the imposition of consecutive sentences for violations of both subsections").

### III. CONCLUSION

We have considered all of appellants' arguments and find that none of them requires reversal. Accordingly, the judgments of conviction are affirmed.

---

13. The legislative histories of these two subsections reinforce our conclusion. The House Report provides: "Subsection (b) prohibits *acquisition or maintenance of an enterprise* through the proscribed pattern of racketeering activity or collection of unlawful debt," while "Subsection (c) prohibits *the conduct of the enterprise* through the prohibited pattern of activity or collection of debt." H.R.Rep. No. 1549, 91st Cong. 2d Sess. 57, *reprinted in* 1970 U.S. Code Cong. & Ad. News 4007, 4033 (emphasis added).